889 P.2d 875

**Jack KEY and Jack Key Motor Company, Inc., Plaintiffs–Appellees/Cross–Appellants,**

v.

**CHRYSLER MOTORS CORPORATION, Defendant–Appellant/Cross–Appellee.**

No. 14863.

Court of Appeals of New Mexico.

Jan. 13, 1995.

Certiorari Granted Feb. 13, 1995.

Jerry Severson, El Paso, Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, for plaintiffs-appellees, cross-appellants.

Barney James Reeves, Mark S. Sweetman, Reeves, Chavez, Greenfield, Acosta & Walker, P.A., Las Cruces, for defendant-appellant, cross-appellee.

Sarah M. Singleton, Montgomery & Andrews, P.A., Santa Fe, Robert D. Cultice, Richard M. Gilbert, Goldstein & Manello, P.C., Boston, MA, for amici curiae American Auto. Mfrs. Ass'n and Ass'n of Intern. Auto. Mfrs., Inc.

Jason W. Kent, Glen A. Krahenbuhl, Kent & Widland, P.C., Albuquerque, for amicus curiae N.M. Auto. Dealers Ass'n.

## OPINION

APODACA, Judge.

On the court's own motion, the opinion filed on December 12, 1994 is withdrawn and the following opinion is substituted in its place.

Chrysler Motor Company (Chrysler) appeals from a judgment awarding Jack Key and Jack Key Motor Company (Key) $300,000 in damages under the New Mexico Motor Vehicle Dealers Franchising Act, NMSA 1978, Sections 57–16–1 through –16 (Repl. Pamp.1987 & Cum.Supp.1993) (the Act). Chrysler raises three issues on appeal; whether: (1) Key had standing to sue under the Act; (2) sufficient evidence existed to support the finding that Chrysler acted unreasonably in withholding its consent to the sale of the franchise and whether the trial court applied the proper legal standard in making this determination; and (3) Key's own negligence required reduction of the damages award. Key filed a cross-appeal, arguing that the trial court erred in refusing to admit certain evidence of Key's claimed future damages.

On Chrysler's direct appeal, we hold that: (1) Key had standing to sue; (2) the evidence was sufficient to support the finding that Chrysler acted unreasonably; and (3) Key's negligence, if any, did not require reduction of the damages awarded under the Act. On Key's cross-appeal, we hold that the trial court did not abuse its discretion in refusing to admit the evidence of claimed future damages. We thus affirm.

## I. BACKGROUND

In 1988, Key entered into an agreement to purchase a Chrysler/Plymouth franchise from Borman Motor Company (Borman) in Las Cruces, New Mexico. The agreement was contingent upon Chrysler's approval of the transfer. Key already owned and operated a Jeep/Eagle franchise with Chrysler. Key sought Chrysler's approval of the proposed transfer under an application for an additional franchise.

Although Chrysler's Phoenix Zone Manager recommended approval of the transfer, Chrysler refused to approve the transfer because Key failed to meet his Minimum Sales Responsibility (MSR) for the Jeep/Eagle line of vehicles sold under his existing franchise. The MSR was designed by Chrysler to measure sales performance. Under the existing

franchise between Chrysler and Key, the MSR was defined as the minimum number of vehicles a dealer must sell within one year to reach the average sales penetration of a particular line of vehicles in the relevant market. The MSR was based on a formula multiplying the new car or truck registrations in the dealership's locality with the line market share in the sales zone within the sales locality.

The trial court found that Chrysler's reliance on Key's MSR was unreasonable because certain economic and geographic factors rendered it inaccurate. The trial court also determined that both Key and Chrysler were negligent for failing to correct the inaccuracies. Reasoning that concepts of tort theory did not apply to the statutory cause of action, however, the trial court held that Chrysler was liable for all compensatory damages Key suffered for Chrysler's violation of the Act, without any offset for Key's purported negligence. These damages were based on Key's loss of the benefit of the bargain. During the course of the non-jury trial, the trial court refused to admit Key's evidence concerning future profits as proof of damages. Additional facts will be discussed as relevant to our discussion.

## II. DISCUSSION

### A. Chrysler's Direct Appeal

#### 1. Standing

■■■ Chrysler asserts that Key, as a prospective purchaser of the Chrysler/Plymouth franchise, lacked standing under the Act to sue Chrysler for unreasonably withholding consent to the sale. Based on the plain language of the Act and considering the policy and purposes behind the Act, we determine that Key had standing to sue. In reaching this determination, we consider the language of the statutes at issue in the context of the entire Act, *see State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353–54, 871 P.2d 1352, 1359–60 (1994), with our primary concern being to ascertain and give effect to the legislature's intent, *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). Unless the legislature indicates otherwise, we give the words of the statute their ordinary meaning. *Id.*

Key based his claim for damages on allegations that Chrysler violated NMSA 1978, Section 57–16–5(L) (Repl.Pamp.1987). This section makes it unlawful for a manufacturer to:

> prevent or attempt to prevent by contract or otherwise any motor vehicle dealer or any officer, partner or stockholder of any motor vehicle dealer from selling or transferring any part of the interest of any of them to any other person or party; provided, however, that no dealer, officer, partner or stockholder shall have the right to sell, transfer or assign the franchise or power of management or control thereunder without the consent of the manufacturer, distributor or representative except that consent shall not be unreasonably withheld.

*Id.* As stated, this provision prohibits a manufacturer from unreasonably withholding its consent to the sale, transfer or assignment of a franchise. The question before us is whether Key, as a prospective purchaser of an automobile dealership, had standing to pursue a claim under Section 57–16–5(L) against Chrysler, a manufacturer, who withheld its consent to the transfer of the franchise. Chrysler contends that the language of this section and the underlying intent of the legislature was to protect only the selling dealer, in this case Borman, and not a prospective buyer. Thus, Chrysler argues that Key, as a prospective buyer, lacked standing to sue. We disagree.

NMSA 1978, Section 57–16–13 (Repl. Pamp.1987), which defines the right of action for damages under the Act, states:

> In addition to any other judicial relief, *any person* who shall be injured in his business or property by reason of anything forbidden in this act may sue therefor in the district court and shall recover actual damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

(Emphasis added.) This section does not limit a right of action to the selling dealer; rather, it expressly protects "*any person* who shall be injured in his business or property." (Emphasis added.) Additionally, the Act applies "to *all persons,* manufacturers, repre-

sentatives, distributors and dealers." NMSA 1978, § 57–16–2 (Repl.Pamp.1987) (emphasis added). A "person" is defined as "every natural person, partnership, corporation, association, trust, estate or any other legal entity." NMSA 1978, § 57–16–3(C) (Repl. Pamp.1987). Based on the plain language of the Act, because Key is a "natural person," and therefore is "any person," we conclude that he has standing to sue Chrysler under the Act. Consequently, we are not persuaded by Chrysler's argument that the legislature intended to protect only selling dealers from violations of this provision of the Act because we find nothing in the language of Section 57–16–5(L) that specifically limits a cause of action to the selling dealer only.

Our conclusion that Key, as "any person," has standing to sue under the Act is supported by our Supreme Court's decision in *General Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 703 P.2d 169 (1985). There, the Court interpreted Section 57–16–13 to confer standing on individual retail buyers of an automobile who sought damages against the manufacturer for breach of warranty under the Act. *Id.* at 76, 703 P.2d at 173. The Court based its conclusion on the statutory language, the overall purpose of the Act, and the legislature's intent to provide a remedy for warranty abuse. *Id.* Thus, in *Anaya*, our Supreme Court did not limit the right to sue under the Act to the selling franchise dealer only. Rather, based on the policy of the Act, the Court specifically concluded that a retail buyer "had standing to invoke the protection of the Act." *Id.*

We find the rationale of *Anaya* helpful here. As did our Supreme Court in *Anaya*, we conclude that the policy of the Act implicitly evinces an intent to prohibit manufacturers from unreasonably withholding consent to the sale of a franchise. The legislature declared its policy for the Act as follows:

> The distribution and sale of motor vehicles in this state vitally affects the general economy of the state and the public interest and welfare of its citizens. It is the policy of this state and the purpose of this act to exercise the state's police power to ensure a sound system of distributing and selling motor vehicles and regulating the

manufacturers, distributors, representatives and dealers of those vehicles to provide for compliance with manufacturer's warranties, and to prevent frauds, *unfair practices, discriminations, impositions and other abuses of our citizens.*

NMSA 1978, § 57–16–1 (Repl.Pamp.1987) (emphasis added); *see also Anaya*, 103 N.M. at 76, 703 P.2d at 173. The Act's declaration of policy specifies the prevention of "unfair practices, discriminations, impositions and other abuses" as a priority. *See id.* at 76, 703 P.2d at 173 (Act's declaration of policy to promote compliance with manufacturer's warranties a priority). This policy, coupled with the broad language of Section 57–16–13, evinces a legislative intent to make remedies available to a wide range of potential plaintiffs, not just *current* franchise owners as argued by Chrysler. *See Albuquerque Hilton Inn v. Haley*, 90 N.M. 510, 565 P.2d 1027 (1977) (dicta that remedial legislation should be liberally construed so as to suppress the mischief and advance the remedy). Thus, we conclude that, based on the policy of the Act, a prospective purchaser of an automobile dealership has standing to invoke the protection of the Act. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1382–83 (3d Cir.1992) (concluding that under the plain language of the Pennsylvania Board of Vehicles Act, which allowed "any person who is or may be injured by a violation of a provision of this act" to bring an action for damages or equitable relief, a prospective purchaser of an automobile franchise had standing to sue for violation of the Act by an automobile distributor), *cert. denied*, —— U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Chrysler cites *Beard Motors, Inc. v. Toyota Motor Distributors, Inc.*, 395 Mass. 428, 480 N.E.2d 303 (1985), for the proposition that other courts examining similar statutes have denied standing to a prospective purchaser of an automobile dealership. In *Beard*, the plaintiff was a currently franchised Chevrolet dealer who had entered into an agreement to purchase a Toyota dealership. *Id.* 480 N.E.2d at 304. The Massachusetts Supreme Court held that the plaintiff did not have standing to sue Toyota for unreasonably withholding its consent to the sales agreement. *Id.* The Massachusetts

statute at issue permitted *"[a]ny* franchisee or *motor vehicle dealer* who suffers any loss of money or property" because of a violation of the act to bring an action for damages and equitable relief. *Id.* at 305 (quoting Mass. Gen.L. ch 93B, § 12A (1977)). While acknowledging that the plain language of the act would allow the plaintiff to sue, the court considered whether the plaintiff's alleged injury, namely the loss of anticipated profits and capital appreciation of the Toyota dealership, was within the area of concern of the statutory scheme. *Id.* Because the court in *Beard* determined that the legislature intended "to protect motor vehicle franchisees and dealers from the type of injury to which they had been susceptible by virtue of the inequality of their bargaining power and that of their affiliated manufacturers and distributors," it concluded the plaintiff did not have standing. *Id.* at 306. Thus, *Beard* based its holding on the legislature's intent behind the act.

We consider *Beard* distinguishable from the present case for this same reason, that is, because the New Mexico Act indicates an intent to grant standing to a broader class of people than the Massachusetts statute. *Compare* § 57–16–13 *with* Mass.Gen.L. ch. 93B, § 12A (1984); *see Anaya,* 103 N.M. at 76, 703 P.2d at 173 (granting standing under the Act to retail purchasers of automobile). We note that, before engaging in the analysis of whether the plaintiff's alleged injury fell within the narrowly defined area of concern, *Beard* recognized that the legislature could indicate a broader grant of standing. *Beard,* 480 N.E.2d at 306. This language indicates to us that if the Massachusetts Legislature had clearly stated a broader grant of standing, *Beard* may have engaged in a different analysis. *See id.* We therefore decline to follow *Beard.*

Additionally, we decline to follow other authority cited by Chrysler and amici curiae because they also involve standing statutes that contain more limiting language than that contained in our own Section 57–16–13. *See, e.g., Knauz v. Toyota Motor Sales, USA, Inc.,* 720 F.Supp. 1327, 1329–30 (N.D.Ill.1989) (the Illinois act provided that dealers and franchisees may bring private causes of ac-

tion; plaintiff was a motor vehicle dealer but did not have an existing franchise with Toyota; the court held that plaintiff did not have standing to sue Toyota because, by statute, the alleged wrongful action had to be taken against a franchise and the statute distinguished between an existing franchise and a franchise offering); *Tynan v. General Motors Corp.,* 248 N.J.Super. 654, 591 A.2d 1024, 1029 (Ct.App.Div.) (plaintiff, who had sold his GM franchise several months before seeking to acquire another GM franchise, did not have standing to sue GM for allegedly wrongfully rejecting him as a prospective franchisee; statute provided that franchisee may bring action against franchisor), *cert. denied,* 127 N.J. 548, 606 A.2d 362 (1991), *rev'd in part on different grounds,* 127 N.J. 269, 604 A.2d 99 (1992) Consequently, these cases do not persuade us that Key lacked standing to sue under New Mexico's Act.

At oral argument, Chrysler cited *Roberts v. General Motors Corp.,* 138 N.H. 532, 643 A.2d 956 (1994), for the proposition that a prospective purchaser of an automobile dealership lacked standing to sue under New Hampshire's Dealership Act, N.H.Rev.Stat. Ann. Section 357–C (1984 & Supp.1993), an act with a standing provision that closely resembles the standing provision in our statute. *Compare* § 57–16–13 *with* N.H.Rev. Stat.Ann. § 357–C:12, II (1984). We decline to follow the New Hampshire Supreme Court's holding that New Hampshire's Dealership Act did not convey standing to prospective purchasers, in light of our Supreme Court's holding in *Anaya. Anaya* interpreted Section 57–16–13 to confer standing to consumer purchasers of an automobile. Thus, the New Mexico Act, as interpreted by the Court in *Anaya,* grants standing to a broader class of people than does the New Hampshire Dealership Act, as interpreted by the *Roberts* court.

■ Notwithstanding the standing issue, Chrysler argues that if an existing dealer receives fair and reasonable compensation for the value of its business, a prospective purchaser has no cause of action. Chrysler bases this argument on NMSA 1978, Section 57–16–9 (Repl.Pamp.1987), that states:

Anything to the contrary notwithstanding, it shall be unlawful for the manufacturer, distributor or representative without due cause to fail to renew on terms then equally available to all its motor vehicle dealers, to terminate a franchise *or to restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation for the value of the business.*

(Emphasis added.) Based on this language, Chrysler contends a manufacturer can restrict the transfer of a dealership, either reasonably or unreasonably, as long as the existing dealer receives "fair and reasonable compensation." In such a case, argues Chrysler, a prospective purchaser has no cause of action. Chrysler therefore argues that, because Borman received fair and reasonable compensation for the sale of its dealership, Key has no cause of action against Chrysler. We disagree.

We do not interpret Section 57–16–9 to prevent a prospective purchaser from bringing a cause of action. We find no language in that section to the effect that, if the existing dealer receives fair and reasonable compensation, despite the manufacturer's lack of due cause for terminating the franchise or restricting its transfer, no other person has a cause of action despite being injured by the manufacturer's actions. Rather, we conclude that Section 57–16–9 more reasonably applies only to restrict the existing dealership itself, thus preventing the existing dealer from bringing an action despite the manufacturer's unlawful behavior, so long as the dealer has received fair and reasonable compensation. This is a reasonable interpretation of the purpose of this section because, under general principles of contract law, if the dealer received fair and reasonable compensation, the dealer would have no damages. *See Board of Educ. v. Jennings*, 102 N.M. 762, 765, 701 P.2d 361, 364 (1985) (" '[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach.' ") (citation omitted); *Fredenburgh v. Allied Van Lines, Inc.*, 79 N.M. 593, 596, 446 P.2d 868, 871 (1968) ("The measure of damages should be that which fully and fairly compensates for the injuries received.").

■ Additionally, if we were to interpret Section 57–16–9 to prevent any aggrieved person from pursuing a cause of action based on the manufacturer's wrongful conduct in refusing to transfer, terminating, or failing to renew a franchise, we would negate several other sections of the Act, including Section 57–16–8, Section 57–16–11, and Section 57–16–13. This would be contrary to the general rule of statutory construction that an interpretation of a statute that creates an inconsistency should be avoided, and since all laws are presumed to be consistent with each other, every effort should be made to harmonize and reconcile them. *See State ex rel. Maloney v. Neal*, 80 N.M. 460, 462, 457 P.2d 708, 710 (1969) (stating established rule of statutory construction that, if possible, statute should be construed to give effect to all of its provisions so that one part will not destroy another). For example, interpreting Section 57–16–9 to allow a manufacturer to fail to renew, terminate, or restrict the transfer of a franchise without due cause and escape all liability so long as fair and reasonable compensation was paid to the dealer, would allow a manufacturer to impose unreasonable restrictions in these areas and thereby avoid the applicability of Section 57–16–8. It would also prevent other "injured" persons from pursuing a cause of action and thereby conflict with Section 57–16–11 and Section 57–16–13, which unequivocally grant standing to pursue a cause of action to "the aggrieved person" and to "any person who shall be injured in his business or property," respectively. Thus, we conclude that, while Section 57–16–9 may prevent an existing dealer from bringing a cause of action in certain circumstances, it does not restrict a prospective purchaser from bringing suit.

Arguing against the holding we have chosen to adopt in this opinion, Chrysler and amici curiae predict dire consequences, in particular, the threat of litigation whenever an application is denied, to manufacturers and consumers if prospective buyers of franchises are allowed to sue for violations of Section 57–16–5(L). As noted in *Big Apple BMW*, 974 F.2d at 1383, however, when a

manufacturer has reasonably denied an application, it has the defense of reasonableness.

> [T]he fear of litigation is not alien to car manufacturers nor limited exclusively to them; they are subject to all kinds of liabilities—product, negligence, and, even under this statute, liability to franchisees. These are subsumed in the cost of doing business and from society's viewpoint have favorable aspects [that] outweigh the negative ones.

*Id.* We emphasize that our decision does not force a manufacturer to accept involuntarily a prospective franchisee, but merely makes a manufacturer potentially liable to a prospective buyer when it unreasonably withholds its consent.

■ Finally, any potential problems posed by the possibility of injunctive relief should be readily addressed by the equitable nature of such relief. Specifically, Chrysler and amici curiae contend that the selling dealer may be placed in a position where it cannot sell the dealership pending the outcome of an action brought by a prospective buyer or may be forced out of business by prolonged litigation in which it is an involuntary participant and consumers are deprived of its services. If injunctive relief is sought, however, the interests of the selling dealer and consumers would be protected because, before granting injunctive relief, the trial court must exercise its discretion and balance the equities and hardships. *See generally Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 485–86, 806 P.2d 1068, 1075–76 (Ct.App.1990) (in deciding whether to grant injunctive relief, the trial court will consider a number of factors, including the interests of third parties and whether plaintiff has an adequate remedy at law), *cert. denied,* 111 N.M. 529, 807 P.2d 227 (1991). Also, SCRA 1986, 1–066 (Repl.1991), requires a plaintiff seeking equitable relief to post security for payment of costs and damages to any party wrongfully enjoined or restrained. Additionally, in *La-Balbo v. Hymes,* 115 N.M. 314, 850 P.2d 1017 (Ct.App.), *cert. denied,* 115 N.M. 359, 851 P.2d 481 (1993), this Court recently set out the factors the trial court must consider in ruling on a motion for a preliminary injunction. In *LaBalbo,* this court stated:

> To obtain a preliminary injunction, a plaintiff must show that (1) the plaintiff will suffer irreparable injury unless the injunction is granted; (2) the threatened injury outweighs any damage the injunction might cause the defendant; (3) issuance of the injunction will not be adverse to the public's interest; and (4) there is a substantial likelihood plaintiff will prevail on the merits.

*Id.* at 318, 850 P.2d at 1021. Therefore, we are not persuaded that, by allowing a prospective purchaser of an automobile dealership to sue the manufacturer for unreasonably withholding consent for the transfer, will wreak the havoc predicted by Chrysler and amici curiae.

Based on the legislature's apparent intent to provide a broad grant of standing in Section 57–16–13 and the substantive cause of action defined in Section 57–16–5(L), we determine that Key, as a prospective purchaser of an automobile dealership, had standing to sue Chrysler for unreasonably withholding its consent to transfer an additional franchise to him. *See Big Apple BMW,* 974 F.2d at 1383; *Anaya,* 103 N.M. at 76, 703 P.2d at 173; *cf. Beard Motors Inc.,* 480 N.E.2d at 305 (standing limited to "[a]ny franchisee or motor vehicle dealer").

## 2. Standard of Review

■ The trial court found that the use of the MSR when properly applied was a reasonable basis for assessing sales ability. In this case, however, it determined that Chrysler was negligent in establishing the MSR area for Key's dealership "without taking into account the distorted market sales area caused by fraudulent registration in New Mexico of vehicles owned by Texas residents and the proximity of competing dealers in El Paso." The trial court also determined that Chrysler, through its Market Review Committee, relied on the reported MSR. Although at the time it denied approval of the franchise transfer Chrysler was not actually aware of the circumstances making the MSR inaccurate, the trial court nevertheless concluded that the mathematical formula for

determining the MSR was inaccurate and that application by Chrysler of the inaccurate MSR was unreasonable.

Chrysler argues that the trial court applied an incorrect standard of review and asserts that the proper standard was whether Chrysler could have reasonably concluded, based on the facts known to Chrysler's Market Review Committee at the time, that Key was materially deficient with respect to one or more appropriate, performance-related criteria. *See, e.g., In re Van Ness Auto Plaza, Inc.,* 120 B.R. 545, 549 (Bankr. N.D.Cal.1990). Even if we were to accept this statement as the appropriate standard for determining unreasonableness, we would find no error nonetheless because the trial court found the MSR formula to be inaccurate. Although not stated in precisely the language urged by Chrysler, the findings and conclusions indicate that the trial court implicitly considered the inaccurate MSR to be an inappropriate criterion for judging Key's sales performance and Chrysler's reliance on it in refusing to consent to the franchise transfer was therefore unreasonable.

█ The more difficult question is whether Chrysler should be liable for relying on the inaccurate MSR when it did not actually know the facts rendering the MSR inaccurate. We are persuaded that, because Chrysler determined the elements for calculating the MSR and the formula for measuring a dealer's sales performance, Chrysler had an obligation to make reasonable inquiries about whether local conditions rendered the MSR on which it relied inaccurate.

The fact that the Jeep/Eagle franchise agreement with Key stated that Chrysler would adjust the MSR at the dealer's request if appropriate to do so fails to fulfill this obligation. First, this agreement related only to the Jeep/Eagle dealership, not to the dealership Key was attempting to acquire from Borman, and the trial court found that Chrysler had not called Key's attention to

the importance of achieving the MSR. Second, the agreement does not explicitly place an affirmative duty on Key to request an adjustment in the MSR, but merely gives Key the option of requesting such an adjustment.[1]

Chrysler does not challenge the trial court's findings that the registration of vehicles in New Mexico by Texas residents and the proximity of the El Paso, Texas, metropolitan area to Key's sales area rendered the MSR inaccurate. As stated above, the trial court could correctly determine that this inaccuracy rendered the MSR an inappropriate criterion for judging Key's sales performance and that Chrysler's sole reliance on Key's failure to meet the inaccurate MSR rendered its withholding consent unreasonable.

### 3. Offset of Damages for Key's Negligence

█ Chrysler argues that the amount of the award should be reduced to reflect Key's liability for his own negligence in failing to inform Chrysler of the conditions making the MSR inaccurate. Although the trial court found Key fifty percent negligent in this regard, it determined this negligence was not a factor in awarding damages because Key did not owe Chrysler any statutory duty and the doctrine of comparative negligence did not apply to an action that was in the nature of a breach of contract. *See Bowlin's, Inc. v. Ramsey Oil Co.,* 99 N.M. 660, 672, 662 P.2d 661, 673 (Ct.App.) (comparative liability not part of the Uniform Commercial Code), *cert. denied,* 99 N.M. 644, 662 P.2d 645 (1983); *see also Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 728, 779 P.2d 99, 105 (1989) (findings of comparative negligence are inapplicable for breach of contract and the vicarious liability of partners). We agree with the trial court's conclusion that the Act imposed no duty on Key. *Cf.* § 57–16–5 (imposing duty on manufacturers, distributors and rep-

---

1. Although the trial court in this case determined the MSR was a reasonable basis for assessing sales ability when properly applied, we note that various courts have questioned it. *See, e.g., Marquis v. Chrysler Corp.,* 577 F.2d 624, 632–33 (9th Cir.1978) (finding the MSR "suspect as the single indicator of satisfactory sales performance" and

holding that, where Chrysler had treated the MSR as a goal for the dealer rather than a condition of the agreement and there was evidence of other motives for terminating the dealership, Chrysler violated federal law when it terminated the dealership based on the dealer's failure to satisfy the MSR).

resentatives). Additionally, the Act does not provide for any damage offset. *See* § 57-16-13 (injured person may recover actual damages, costs and attorney's fees).

Although it may appear inequitable at first blush to hold Chrysler totally responsible for the inaccuracies in the MSR, we are not persuaded that Key owed Chrysler any legal duty to request adjustment of the MSR. Key's cause of action in this case derives solely from the statute. *Cf.* Carmine R. Zarlenga, *Defending Against Litigation by Third Parties in the Franchise Context*, 11 Franchise Law J., Summer 1991, at 19–23 (outlining potential causes of action based on breach of contract, tort, and equitable estoppel theories). Chrysler does not argue that Key had a statutory duty relating to the MSR. Instead, Chrysler relies on the sales agreement relating to the Jeep/Eagle dealership as imposing a duty on Key. As noted above, this agreement allows Key to request an adjustment, but it does not require Key to do so. The agreement required Key to meet the MSR and provided that Chrysler could terminate the agreement if Key failed to do so. The agreement did not impose any duty on Key to request a change in the MSR when he applied for an additional franchise. Because there was no statutory or contractual duty imposed on Key to inform Chrysler of the inaccuracy of the MSR, we affirm the trial court's conclusion that Chrysler is liable for all the compensatory damages Key suffered from its unreasonably withholding consent to the transfer.

### B. Key's Cross–Appeal

#### 1. Evidence of Future Damages

■ In his cross-appeal, Key challenges the trial court's exclusion of evidence concerning projections of potential lost future profits over a twenty-five-year period. Phillip T. Kolbe, Ph.D., Key's expert witness, testified concerning various documents he consulted in reviewing industry trends. He also testified about the growth of the Las Cruces metropolitan area and the positive effect that growth would have on increasing vehicle sales for dealers. He testified his projections were based on a twenty-five-year period because industry studies showed that the average life of a dealership is twenty-five years and because Jack Key and his son planned to operate the dealership for that period of time. In his projections, he considered the financial statements from Key's Jeep/Eagle dealership and an estimate of sales for the Chrysler/Plymouth dealership. Although the trial court refused to admit Dr. Kolbe's reports projecting future damages, evidence was admitted on what the projected net earnings of the Chrysler/Plymouth dealership would be and what the owners' salaries would be. In determining the present value of the sales price of the Chrysler/Plymouth dealership, Dr. Kolbe testified concerning his calculations for the potential cash flows for the years 1989 through 1992. This testimony was also reflected in Plaintiff's Exhibit 38 that the trial court deemed inadmissible.

We have reviewed Dr. Kolbe's testimony, as well as Plaintiff's tendered Exhibits Nos. 38 through 42 that were not admitted. From this review, it appears to us that Dr. Kolbe's oral testimony overlapped the evidence in these exhibits, except for the evidence concerning the present value of cash flows for the years 1993 through 2013.

We are not persuaded that the trial court abused its discretion in determining that this evidence was inadmissible. *See generally City of Santa Fe v. Komis*, 114 N.M. 659, 663, 845 P.2d 753, 757 (1992) (trial court's decision to admit or exclude evidence will be reversed only for an abuse of discretion). The trial court correctly considered the measure of damages to be Key's loss of the benefit of the bargain. *See generally* 3 Charles L. Knapp, *Commercial Damages: A Guide to Remedies in Business Litigation* ¶ 61.06[9] (1994). Although Key's lost profits may be relevant in computing damages, it was not an abuse of discretion for the trial court to determine that the actual evidence Key sought to admit was too speculative to be of any use in that regard. There was evidence that the Chrysler/Plymouth dealership had been losing substantial amounts of money and, although Key was able to make a small profit during the few weeks he managed that dealership, this period was too

short on which to base long-term, substantial profit projections.

The trial court allowed a tender of the evidence, but stated in doing so that it was not aware of any New Mexico authority authorizing future damages projected through a period of twenty-five years. The court also stated, "I just cannot see those kind of damages. I see no basis for picking out 25 years or 10 years, or any reasonable basis for that." The trial court reiterated that it did not believe that kind of evidence represented a proper measure of damages.

In taking the above-noted approach, the trial court clearly indicated that it did not believe lost profits projected over a twenty-five year period, or any period, were a reasonable basis for damages. Unlike the cases cited by Key, it is apparent that here, the trial court considered the evidence on this issue, even if it did not accept the exact figures contained in the excluded exhibits. *Cf. Normand ex rel. Normand v. Ray,* 107 N.M. 346, 348–49, 758 P.2d 296, 298–99 (1988) (trial court erred in not allowing evidence on the issue of the best interests of the children in a habeas corpus action to determine custody); *Padilla v. Montano,* 116 N.M. 398, 406, 862 P.2d 1257, 1265 (Ct.App.1993) (trial court erred in limiting determination of father's income to tax returns and not considering evidence of other sources of revenue such as cash savings and IRA); *State v. Aragon,* 116 N.M. 291, 293–95, 861 P.2d 972, 974–76 (Ct. App.) (trial court had no basis to exclude evidence of polygraph because it refused to allow defendant to make an offer of proof), *cert. denied,* 116 N.M. 71, 860 P.2d 201 (1993). For these reasons, we determine that the trial court's action in excluding the evidence of future profits was not contrary to logic or reason. *See Komis,* 114 N.M. at 663, 845 P.2d at 757 (the trial court abuses its discretion when its decision is contrary to logic and reason).

### 2. Attorney Fees

■ Key requests reasonable attorney fees for the services of his counsel on appeal. Attorney fees are authorized by statute. *See* § 57–16–13. Where an award of fees is authorized by statute, fees are appropriate for services performed on appeal. *Hale v. Basin Motor Co.,* 110 N.M. 314, 321–22, 795 P.2d 1006, 1013–14 (1990). Based on our affirmance of the trial court's judgment, we determine that Key is entitled to a reasonable award of attorney fees for the services of Key's counsel on the direct appeal, to be paid by Defendant and to be determined by the trial court on remand. No attorney fees are awarded on the cross-appeal.

### III. CONCLUSION

On the direct appeal, we conclude that Key had standing, that the trial court applied the correct standard, and that there should be no offset under the Motor Vehicle Dealers Franchising Act for Key's own negligence, if any. On the cross-appeal, we hold that the trial court did not abuse its discretion in excluding certain evidence of projected future damages. We therefore affirm the trial court's judgment. Key is awarded attorney fees, plus applicable gross receipt tax, for the services of his attorney on appeal. This case is remanded to the trial court for a determination of the amount of attorney fees to be awarded to Key.

**IT IS SO ORDERED.**

ALARID, J., concurs.

HARTZ, J., concurs in part and dissents in part.

HARTZ, Judge (dissenting).

I respectfully dissent. I have two substantial disagreements with the majority.

First, as I understand the New Mexico Motor Vehicle Dealers Franchising Act, a prospective purchaser of an automobile dealership cannot sue a manufacturer for refusing to permit a dealer to transfer the franchise to the prospective purchaser unless the dealer did not receive "fair and reasonable compensation for the value of the [dealership]." NMSA 1978, § 57–16–9 (Repl. Pamp.1987). After Borman's sale to Key fell through, Borman sold the dealership to a third party. Because Key neither pleaded nor proved that Borman failed to receive

proper compensation, Key does not have a claim against Chrysler.

Second, even if Key may maintain a cause of action against Chrysler for unreasonably withholding consent to the transfer of the Borman franchise to Key, I disagree with the majority's understanding of what it means to withhold consent unreasonably. I do not read the Act to require a manufacturer to conduct a reasonable investigation to determine whether a prospective franchisee is qualified to hold a franchise. I read the Act to require only that the manufacturer exercise objectively reasonable business judgment. In particular, the manufacturer satisfies its statutory duty if it informs the prospective franchisee of the criteria for selection and makes a reasonable business judgment based on what it knows, including information provided by the prospective franchisee. If Chrysler made clear to Key that Key's application for the franchise could well be rejected because he had fallen far short of meeting his minimum sales responsibility (MSR) for the Jeep–Eagle line of vehicles sold under his existing franchise, then Chrysler had no further duty to discover factors indicating that the MSR computation for Key was inaccurate. If Key thought that reliance by Chrysler on his MSR was inappropriate, he had the burden of advising Chrysler of the potential inaccuracies. Because it appears that the district court did not apply the proper standard in determining whether Chrysler unreasonably withheld consent to the transfer of the franchise, I would remand to the district court for further findings and conclusions.

## I. KEY HAS NO CAUSE OF ACTION

NMSA 1978, Section 57–16–13 (Repl. Pamp.1987), states that "any person who shall be injured in his business or property by reason of anything forbidden in this act may sue therefor." Does this language authorize the present suit?

Two reported decisions have interpreted similar language in similar circumstances. In *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1382–83 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993), the court considered whether the Pennsylvania Board of Vehicles Act permitted a prospective purchaser of an automobile dealership to sue a franchisor for withholding consent to transfer of the franchise. The Pennsylvania statute authorized suit by "any person who is or may be injured by a violation of a provision of this act." *Id.* at 1382 (quoting 63 Pa.Stat.Ann. § 818.20(a)). Focusing on the words "any person who is or may be injured," the court predicted that the Pennsylvania Supreme Court would grant standing to the purchaser.

In *Roberts v. General Motors Corp.,* 138 N.H. 532, 643 A.2d 956 (1994), the New Hampshire Supreme Court reached the opposite result. A prospective purchaser sued General Motors for refusing to consent to the transfer to him of a dealership franchise. The New Hampshire statute conveyed standing upon "any person who is injured in his business or property by a violation of this chapter." *Id.* 643 A.2d at 958 (quoting N.H.Rev.Stat.Ann. 357–C:12, II (1984)). The court ruled that a prospective purchaser cannot be injured in "business or property" and therefore lacks standing.

I would not rely on either of these opinions. Rather than focusing on the language "any person who shall be injured in his business or property," I would focus on the remaining language of Section 57–16–13, namely the requirement that the injury be "by reason of anything forbidden in this act." The dispositive question is whether Chrysler has done "anything forbidden in this act" if Borman received proper compensation for the value of the dealership.

To put this question in perspective, one should note an important feature of the Act: the Act evinces no legislative concern for the interests of those who wish to acquire dealer franchises. The various conduct prohibited by the Act is conduct that would directly injure consumers and franchise holders. To be sure, some prohibited actions that would injure franchise holders could also injure prospective franchisees. For example, if a manufacturer unreasonably withholds consent to the transfer of a franchise, both the prospective seller and the prospective purchaser could be injured. What is striking, however, is that no provision of the Act prohibits

conduct that would injure a prospective franchisee when no current holder of a franchise would be injured. A prospective franchisee could be injured just as much by being denied a new franchise as by being denied the right to acquire an existing franchise. Yet, nothing in the Act restricts a manufacturer from denying a new franchise to an applicant, regardless of whether the denial is unreasonable, in bad faith, etc. This is not because the drafters of the Act did not consider the possibility of new franchises. On the contrary, the Act addresses the awarding of new franchises. But the only restrictions on new franchises are for the protection of those already holding franchises, not those seeking a franchise. NMSA 1978, Section 57–16–5(P) (Repl.Pamp.1987), makes it unlawful to "establish an additional franchise for the same line-make in a community where the same line-make is presently being served by an existing motor vehicle dealer if such addition would be inequitable to the existing dealer[.]"

This view of the Act is supported by the opinion of the Massachusetts Supreme Judicial Court in *Beard Motors v. Toyota Motor Distributors*, 395 Mass. 428, 480 N.E.2d 303 (1985). Our Act is modeled closely in structure and substance on the comparable Massachusetts statute. The Massachusetts court said of that statute:

> It is clear from a reading of [the Massachusetts act] as a whole that the intention of the Legislature was to protect motor vehicle franchisees and dealers from the type of injury to which they had been susceptible by virtue of the inequality of their bargaining power and that of their affiliated manufacturers and distributors. The injuries alleged by [the prospective purchaser]—primarily the loss of anticipated profits from the sale of Toyotas and from capital appreciation in the value of the Toyota dealership, due to its inability to obtain the Toyota franchise—are not injuries within the area of legislative concern that resulted in the enactment of [the Massachusetts statute].

*Id.* 480 N.E.2d at 306.

This perspective suggests the proper interpretation of Section 57–16–9, which states:

> Anything to the contrary notwithstanding, *it shall be unlawful for the manufacturer,* distributor or representative *without due cause* to fail to renew on terms then equally available to all its motor vehicle dealers, to terminate a franchise or *to restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation for the value of the business.* (Emphasis added.)

If the manufacturer acts with due cause, there can be no violation. But even if the manufacturer acts without due cause, the conduct is *not unlawful* if the dealer receives "fair and reasonable compensation for the value of the business." In other words, if the manufacturer "buys out" the dealer, or arranges for the dealer to be bought out, then the manufacturer can treat the franchise almost any way it wants—refusing to renew the franchise, terminating the franchise, or restricting the transfer of the franchise. The unambiguous language of Section 57–16–9 indicates that the legislature's underlying concern is protecting the financial equity of the dealer/franchisee.

Because Section 57–16–13 authorizes suit only for an injury "by reason of anything forbidden in this act," a prospective purchaser has a claim against the manufacturer for improperly rejecting a transfer of a franchise only if the seller/franchisee did not receive fair and reasonable compensation for the business. Otherwise, the rejection of the transfer was not forbidden by the Act.

I recognize, as the majority opinion points out, that other provisions of the Act appear to forbid a manufacturer from unreasonably denying transfer of a franchise and do not contain any escape clause permitting the manufacturer to buy out the franchise holder. NMSA 1978, Section 57–16–5(L) (Cum. Supp.1994), makes it unlawful for a manufacturer to

> *prevent* or attempt to prevent by contract or otherwise *any motor vehicle dealer* or any officer, partner or stockholder of any motor vehicle dealer *from* selling or *transferring any* part of the *interest* of any of them to any other person or party; *provided, however, that no dealer,* officer, partner or stockholder *shall have the right*

*to* sell, *transfer* or assign *the franchise* or power of management or control thereunder *without the consent of the manufacturer,* distributor or representative *except that consent shall not be unreasonably withheld.* (Emphasis added.)

The exception to the proviso in the prohibition could be read as itself a prohibition against the manufacturer's unreasonably withholding consent to a transfer of the franchise. Similarly, NMSA 1978, Section 57–16–8 (Repl.Pamp.1987), states:

*It shall be unlawful* directly or indirectly *to impose unreasonable restrictions on the* motor vehicle dealer or *franchise relative to transfer,* sale, right to renew, termination[,] discipline, noncompetition covenants, site control (whether by sublease, collateral pledge of lease or otherwise), right of first refusal to purchase, option to purchase, compliance with subjective standards and assertion of legal or equitable rights. (Emphasis added.)

Nevertheless, there are sound reasons to interpret Section 57–16–9 as constituting a limitation on Sections 57–16–5(L) and 57–16–8. First, Section 57–16–9 addresses a more limited class of manufacturer conduct than either of the other sections. Both Sections 57–16–5(L) and 57–16–8 are broader in scope than Section 57–16–9. Ordinarily, a section specifically addressing a matter controls over more general language elsewhere in a statute. *See In re Rehabilitation of W. Investors Life Ins. Co.,* 100 N.M. 370, 372–73, 671 P.2d 31, 33–34 (1983); *Lumbermen's Mut. Casualty Co. v. Insurance Comm'r,* 302 Md. 248, 487 A.2d 271, 281 (1985).

Second, if Section 57–16–9 is not a limitation on Sections 57–16–5(L) and 57–16–8, then it appears to have no purpose whatsoever. The majority opinion suggests that Section 57–16–9 serves the purpose of spelling out the result that would arise under general principles of contract law—"[I]f the dealer received fair and reasonable compensation, the dealer would have no damages." Yet, I fail to see why the legislature would feel a need to enact a provision that would produce the same result as would be reached under generally accepted legal principles.

A more likely construction of Section 57–16–9 is that it sets a limit on damages. If, for example, the dealership is improperly terminated, the dealer can recover only fair and reasonable compensation for the value of the business. Consequential damages (such as injury to reputation) would not be included. It makes little sense, however, to foreclose the recovery of consequential damages by the franchise holder while permitting a potential purchaser to recover consequential damages from the denial of the transfer. Thus, inasmuch as Section 57–16–9 sets a limit on damages for restricting a transfer without due cause, the most reasonable inference is that liability to the proposed transferee is eliminated altogether.

Third, the clause at the beginning of Section 57–16–9—"Anything to the contrary notwithstanding"—supports the interpretation that Section 57–16–9 limits Sections 57–16–5(L) and 57–16–8. Initially, one might interpret this introductory language to mean "notwithstanding any other provisions that make such conduct lawful"; but no other provisions make lawful the conduct described in Section 57–16–9. Rather, the conduct enumerated as unlawful in Section 57–6–9 is presumably already unlawful under Section 57–16–5(L) or 57–16–8 or both. Thus, such a construction of the introductory language would make the language surplusage. To give substance to the introductory phrase of Section 57–16–9, it should be construed as saying, "regardless of any other provisions to the contrary, the following rule controls." The controlling rule is that if the dealer/franchisee receives fair and reasonable compensation, then the manufacturer need not have due cause to restrict the transfer of the franchise, terminate the franchise, etc.

Admittedly, the above construction of the statute is somewhat uncertain. The language of the statute is far from clear. Attempts to extract an unequivocal meaning from the language of the statute are hardly esthetically satisfying. Nevertheless, the above construction best fits the language of the statute.

Moreover, it also best fits the overall legislative intent of the Act. That intent, at least insofar as it relates to the conduct of manu-

facturers and distributors with respect to franchise ownership, is to protect franchise holders, not prospective franchisees. Not only does an appreciation of this intent explain why Section 57–16–9 would evince no concern about possible losses to prospective purchasers of franchises, it also explains why the legislature might affirmatively wish to foreclose prospective purchasers from suing under the Act.

Allowing prospective purchasers to sue could injure holders of franchises. The majority opinion recognizes that a prospective purchaser could cause injury to the franchise holder by obtaining an injunction against a sale by the franchise holder to a second prospective purchaser. Although the majority opinion points out that equitable considerations could well cause a court to deny injunctive relief, a prospective purchaser who makes a strong showing of an unreasonable denial might well obtain at least temporary relief. Also, even if relief is not granted, the franchise holder could incur substantial legal expenses. In addition to potential harm from a suit for injunctive relief, the threat of a suit for damages could hamstring the manufacturer and the dealer in arranging a sale to someone other than the prospective purchaser who files suit.

The legislature may well have concluded that the risk of injury to a dealer/franchisee was great enough that suits by prospective purchasers should be restricted. After all, other provisions of the Act reflect a far greater concern for franchise holders than for prospective franchisees. As already noted, the statute provides no relief to an applicant who is unreasonably denied an additional franchise but does protect existing franchise holders against new franchises that would be inequitable to them. The Act is internally quite consistent in providing that a prospective purchaser of a franchise has no claim if the investment of the franchise holder is secured.

Amici curiae supporting Key argue that Section 57–16–9 should not be interpreted as providing an "escape hatch" for manufacturers, because then various reprehensible conduct would go unpunished and undeterred. One example presented by counsel was racial discrimination. Could a manufacturer discriminate against a transferee on racial grounds and escape liability under the Act so long as the transferor received fair and reasonable compensation for the dealership from a subsequent buyer? This argument has obvious appeal, but it misses the mark. If a prospective transferee were discriminated against on racial grounds, that person may well have a cause of action under various civil rights enactments. Section 57–16–9 would hardly foreclose such a lawsuit. Despite the extraordinarily strong public policy against racial discrimination, there is no need to construe every statute broadly enough to provide an additional cause of action for such discrimination.

In sum, I conclude that Key has no cause of action against Chrysler because he failed to prove, or even plead, that Borman did not "receive fair and reasonable compensation for the value of the business." Section 57–16–9.

## II. UNREASONABLE WITHHOLDING OF CONSENT

I also disagree with the majority's affirmance of the district court's decision that Chrysler unreasonably withheld consent to the transfer of the Borman franchise to Key. The majority states that "[B]ecause Chrysler determined the elements for calculating the MSR and the formula for measuring a dealer's sales performance, Chrysler had an obligation to make reasonable inquiries about whether local conditions rendered the MSR on which it relied inaccurate." In my view, the Act does not impose such an obligation upon Chrysler. If (1) Chrysler informs the prospective purchaser of its intent to rely on the MSR in evaluating whether to approve the transfer of a franchise, (2) the MSR is, in general, an appropriate measure of dealership performance, and (3) Chrysler is not aware of any reason why the MSR would not be an accurate measure in the particular case, then Chrysler could properly refuse to permit transfer of a franchise to a prospective purchaser whose sales performance has been well below the MSR. If the prospective purchaser of the franchise believes that the

calculation of its MSR is inaccurate, it should alert the manufacturer to the problem.

When Section 57–16–5(L) states that a manufacturer's consent to transfer of a franchise "shall not be unreasonably withheld," it is not imposing a tort standard of "reasonableness." It is saying that the manufacturer's reasons for denial must be sound reasons. It is requiring the manufacturer to make an objectively reasonable business decision. Rather than saying that the manufacturer must act with "due care," it is saying that the manufacturer must act with "due cause." *See* § 57–16–9 (manufacturer cannot restrict the transfer of a franchise "without due cause"). The requirements of "due care" and "due cause" will overlap substantially, but they are not congruent. In particular, the due-cause formulation more clearly indicates that the manufacturer need not undertake any independent investigation to determine whether the applicant for the franchise is qualified.

The above conclusions derive from a review of pertinent landlord-tenant law. The phrase "consent shall not be unreasonably withheld" has achieved the status of a term of art in that area of law. It is reasonable to assume that when the legislature adopted this term of art from a related area of the law, it intended the phrase to have a similar meaning, particularly when the rationale for the cannot-be-unreasonably-withheld requirement in the Act is essentially the same as the rationale for the requirement in the common law governing the landlord-tenant relationship.

Restatement (Second) of Property Section 15.2(2) (1976) [hereinafter Restatement] states:

> A restraint on alienation without the consent of the landlord of the tenant's interest in the leased property is valid, but the landlord's consent to an alienation by the tenant cannot be withheld unreasonably, unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent.

Comment a to the section explains:

> The landlord may have an understandable concern about certain personal qualities of a tenant, particularly his reputation for meeting his financial obligations. The preservation of the values that go into the personal selection of the tenant justifies upholding a provision in the lease that curtails the right of the tenant to put anyone else in his place by transferring his interest, but this justification does not go to the point of allowing the landlord arbitrarily and without reason to refuse to allow the tenant to transfer an interest in the leased property. Hence the rule of this section recognizes the restraint on the tenant as valid but allows the tenant to alienate, in spite of the restraint, if the landlord unreasonably withholds his consent to a transfer, unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent.

A similar rationale justifies the provision in Section 57–16–5(L). An automobile manufacturer has a strong financial interest in the qualities of its franchise holders. It should have the authority to forbid the transfer of a franchise to an unsuitable person. At the same time, however, it would be unfair to the transferor, who may have a substantial investment in the franchise and associated dealership, to permit the manufacturer to withhold consent "arbitrarily and without reason."

To be sure, there are differences between the landlord-tenant relationship and the relationship between a franchisor and franchisee. The franchisor and franchisee must work together in ways that are generally unnecessary in the landlord-tenant relationship. The franchisor can therefore argue that in approving franchisees it should not be as restricted as a landlord should be in approving assignees of a tenant. On the other hand, the franchisee can argue that it is entitled to more consideration from the franchisor than a tenant is entitled to from a landlord because its efforts have built goodwill for the franchisor; the franchisee has done more than just pay rent. These interests balance out. The Tenth Circuit Court of Appeals considered both arguments in *Larese v. Creamland Dairies,* 767 F.2d 716 (10th Cir. 1985), and concluded that Colorado would apply the standards of Restatement Section 15.2(2) to the transfer of a franchise.

Similarly, the court in *In re Van Ness Auto Plaza*, 120 B.R. 545 (Bankr.N.D.Cal. 1990), turned to landlord-tenant law in construing a provision of California law providing that an automobile manufacturer's consent to the transfer of a franchise "shall not be unreasonably withheld." Cal.Veh.Code § 11713.3 (West 1987). The court relied on Restatement Section 15.2, although it suggested that courts should defer more to an automobile manufacturer's decision to withhold consent than to a lessor's decision to withhold consent because of the greater difficulty in determining whether a dealer will be a suitable franchisee and because of the closer relationship between a manufacturer and dealer than between a landlord and tenant. 120 B.R. at 548.

One obvious difference between Restatement Section 15.2(2) and Section 57–16–5(L) of the Act is that the latter makes no provision for a "freely negotiated provision" giving the manufacturer an absolute right to withhold consent. The reason for this omission is apparent from the entire thrust of the Act. Given the far superior bargaining power of the manufacturer, the legislature could presume that any provision giving the manufacturer an absolute right to withhold consent was not "freely negotiated." This difference between the Act and the Restatement does not limit the relevance of landlord-tenant law in analyzing Section 57–16–5(L).

Both the Restatement and the above cases applying the Restatement in the franchise context make clear that the cannot-be-unreasonably-withheld requirement does not derive from tort concepts of reasonable care and negligence. The previously quoted paragraph from Comment a to Restatement Section 15.2 states that the landlord should not be able to reject the transfer "arbitrarily and without reason." Comment g states, "A reason for refusing consent, in order for it to be reasonable, must be objectively sensible and of some significance and not be based on mere caprice or whim or personal prejudice." *Larese* based its holding on the general requirement that the parties to a franchise agreement must "deal with one another in good faith and in a commercially reasonable manner." 767 F.2d at 717. *Van Ness*, after

noting several formulations of the proposition stated in Restatement Section 15.2, concluded that they

> are alike in that they focus not on whether the lessor's decision to withhold consent is correct, but on whether there is a substantial basis for the lessor's decision under relevant criteria. None of the authorities suggest that a court is to review the lessor's refusal to consent *de novo* and find that decision unreasonable because the court would have decided differently. The quotation from [*Grossman* [*Grossmann*] *v. Barney*, 359 S.W.2d 475 (Tex.Civ.App. 1962) ] expressly states that withholding consent may be reasonable even if the decision is wrong.

120 B.R. at 548.

Moreover, the conclusion that the cannot-not-be-unreasonably-withheld requirement does not impose a duty of independent investigation finds specific support in landlord-tenant law applying the same requirement. Milton R. Friedman, *Friedman on Leases* § 7.304(C), at 322–23 (3d ed. 1990), states: "The burden of ... furnishing information sufficient to determine unreasonableness is on the tenant. Landlord need not seek out such information. In the absence of such information, landlord may refuse consent." (Footnote omitted.) *See D'Oca v. Delfakis*, 130 Ariz. 470, 636 P.2d 1252, 1253–54 (Ct. App.1981).

From the above authorities, I would conclude that Chrysler's withholding of consent was reasonable if (1) the criteria for evaluating the application for transfer were, in general, reasonable; (2) Chrysler informed Key of the criteria so that Key could supply any information he had relevant to the criteria; and (3) Chrysler had no knowledge of factors that would make the criteria inappropriate in evaluating Key's application. If this construction of Section 57–16–5(L) is correct, then the judgment below must be set aside and the case remanded for further findings by the district court. The district court appears to have applied the wrong standard in determining whether Chrysler violated the statute. Perhaps a fact-finder applying the correct standard would find that Chrysler

violated the standard, but that is a matter to be decided on remand.

The district court's finding number 16 addressed the appropriateness of the use of a dealer's MSR in general. The finding contained the following language:

> MSR is a mathematical calculation designed to measure automobile dealer's sales ability. Chrysler has used MSR since 1957. *The use of MSR,* when properly applied, is a reasonable basis for measuring sales ability, and such *is a reasonable factor to be considered in determining approval or rejection of a requested franchise.* All manufacturers have some basis similar to MSR in measuring sales ability of its dealers, but such frequently are referred to by other names, such as Planning Potential or Safe Reports. Chrysler has a provision in its MSR formula known as a slanted market where exceptional circumstances exist such that the mathematical calculation of a dealer's percentage sales as compared to the sales of all similar type vehicles in a particular area would not be a fair measure of a dealer's sales ability. (Emphasis added.)

I see no basis for rejecting this finding that a low MSR is a reasonable criterion for denying an application for transfer of a franchise. To be sure, it would be unreasonable to terminate a franchise solely on the ground that the dealer failed to attain one hundred percent of MSR. After all, the MSR reflects an average, so necessarily some dealers fail to achieve one hundred percent of the MSR. Consequently, to permit termination solely because of failure to meet one hundred percent of MSR would have "the practical effect of transforming a large proportion of [dealer franchise] agreements into franchises terminable at the pleasure of the manufacturer." *Marquis v. Chrysler Corp.,* 577 F.2d 624, 632 (9th Cir.1978). A far different situation arises when chronic failure to reach fifty percent of MSR is used by the manufacturer to justify denial of an *additional* franchise.

Despite its finding that use of the MSR was ordinarily reasonable, the district court found that the MSR was misleading in this case because of special circumstances. The court's finding number 17 states:

Key's sales area of Dona Ana County has not been recognized as a slanted market, nor has the sales locality been recognized by Chrysler as having its statistics distorted because of the close proximity to the El Paso, Texas metropolitan area. There are geographic and economic factors which are present that distort the total new vehicle registrations in Dona Ana County so that mathematically applying the number of vehicles sold by Key to the total number of new vehicles registered in the county is not representative of the true percentage sales. The two factors that are present in the economic and geographical factors that make the figures distorted are:

A. The State of Texas has a much higher sales tax on new vehicles than the State of New Mexico. Some persons residing in El Paso County, Texas but living close to the New Mexico line purchase new vehicles in El Paso but register them in Dona Ana County so as to take the benefit of the lower sales tax. Such registrations are considered fraudulent but are difficult to detect, principally because the person registering the vehicle will merely give a post office box address for a New Mexico town, such as Anthony or Sunland Park, whereas the applicant actually lives outside the State of New Mexico.

B. The southern boundary of Dona Ana County in some areas goes into the El Paso metropolitan area. Many persons residing in the southern part of Dona Ana County work in El Paso, Texas. It is unreasonable to expect people living closer to the El Paso metropolitan area to drive a longer distance to Las Cruces to purchase or obtain service for a new vehicle. In 1988 approximately forty-four percent (44%) of the new trucks registered in Dona Ana County were sold by dealers in El Paso, Texas.

The court's conclusion of law 6 states:

The negligent acts of Chrysler in establishing its MSR area for the Las Cruces

dealership without taking into account the distorted market sales area caused by fraudulent registration in New Mexico of vehicles owned by persons living in Texas, and the geographic proximity of the competing dealers in El Paso, renders the mathematical formula inaccurate, and the application of an inaccurate formula constitutes an unreasonable refusal to approve transfer of a franchise.

The respect in which Chrysler was negligent, however, is not clear from the court's findings and conclusions. Conclusion of law number 5 states in part:

Both parties to this proceeding were negligent in failing to recognize the effect on the sales locality by the southern part adjoining El Paso. Chrysler was under a statutory duty to be reasonable, and its negligence would render its refusal unreasonable.

Yet, finding number 22 states:

The Market Review Committee [which makes Chrysler's decisions regarding applications for franchise transfers] relied upon the reported MSR of Key, and it did not know of the extenuating circumstances that rendered the MSR inaccurate at the time the committee declined to approve transfer of the franchise.

No other finding by the district court states that Chrysler was in any way informed about, or even alerted to, facts establishing that Key was in a slanted market. Thus, it appears that the district court's conclusion that Chrysler was negligent is based solely on Chrysler's use of the MSR without investigating whether Key was in a slanted market.

Judgment against Chrysler cannot rest on that ground. In the absence of Chrysler's having knowledge of, or being alerted to, information indicating that the market was slanted, Chrysler had no duty to conduct an investigation to determine whether the market was slanted. Assuming, then, that Chrysler had no cause to question the reasonableness of using Key's MSR to evaluate his performance as a dealer, the only questions remaining are (1) whether Chrysler informed Key that it would rely on his MSR and (2) if Chrysler did not inform him,

whether it could reasonably rely on Key's MSR without giving him the opportunity to alert Chrysler to the inappropriateness of such reliance.

Evidence admitted at trial indicates that Key was advised of the importance of the MSR to his application for the Borman franchise. In a letter from the Phoenix zone office dealer placement manager to him on August 11, 1988, Key was told: "As you are aware, your Jeep Eagle sales performance is poor, with an MSR rating of 45% through March, 1988. This could be an obstacle to obtaining the Committee approval. The next meeting of the Market Review Committee is September 16, 1988." Key contends on appeal, however, that he was reassured by the fact that the Phoenix office forwarded his application to Detroit after sending him the August 11 letter. There was also evidence that Chrysler had not indicated to Key in the past that the MSR was of any significance to the continuance of his existing franchise. (This appears to be the foundation of the court's Finding No. 19: "Chrysler did not call to Key's attention the importance of his achieving MSR.") A fact finder might be justified in determining that Key was not adequately advised of the importance of the MSR to his application for the transfer. One might then conclude that it was unreasonable for Chrysler to rely on the MSR in rejecting the transfer to Key. Nevertheless, the evidence supporting Key's argument on this point is hardly overwhelming. This Court therefore should not presume that the district court's judgment in favor of Key was based on this theory. Consequently, the judgment below cannot be affirmed, although it would be appropriate to remand for further findings by the district court.

### III. SUMMARY

I would dismiss the Complaint for failure to state a cause of action. Moreover, even if the Complaint states a cause of action, Key can prevail only if the district court were to find on remand that (1) Key had not been

informed of the importance of his MSR in obtaining approval of the transfer or (2) Chrysler's rejection of the transfer was unreasonable based on the information actually known to Chrysler at the time of the rejection.