918 P.2d 350

**Jack KEY and Jack Key Motor Company, Inc., Plaintiffs–Respondents,**

v.

**CHRYSLER MOTORS CORPORATION, Defendant–Petitioner.**

No. 22587.

Supreme Court of New Mexico.

May 31, 1996.

**766**

Reeves, Chavez, Greenfield, Acosta & Walker, P.A., Barney James Reeves, William R. Anderson, Las Cruces, for Petitioner.

Tucker Law Firm, P.C., Steven L. Tucker, Santa Fe, Cresswell & Roggow, P.A., Charles W. Cresswell, Las Cruces, Jerry Severson, El Paso, TX, for Respondents.

Montgomery & Andrews, P.A., Sarah M. Singleton, Santa Fe, Goldstein & Manello, P.C., Robert D. Cultice, Robert B. Carpenter, Boston, MA, for amicus curiae AAMA & AIAM.

Kent & Widland, P.C., Jason W. Kent, Glen A. Krahenbuhl, Albuquerque, for amicus curiae NMADA.

### OPINION

MINZNER, Justice.

Jack Key and Jack Key Motor Company, Inc. (Key) sued Chrysler Motors Corporation (Chrysler), alleging that Chrysler had unreasonably withheld its consent to the transfer of a Chrysler/Plymouth dealership franchise from the Borman Motor Company (Borman) to Key in violation of the New Mexico Motor Vehicle Dealers Franchising Act, NMSA 1978, §§ 57–16–1 to –16 (Repl.Pamp.1995) (the Act). After a bench trial, the district court concluded that the Act granted Key standing, found that Chrysler had acted unreasonably in violation of the Act, and awarded Key $300,000 in compensatory damages and $125,000 in attorney fees. Chrysler appealed to the Court of Appeals on three issues: (1) whether Key had standing to sue under the Act, (2) whether the trial court applied the proper legal standard in finding that Chrysler unreasonably withheld consent to the transfer, and (3) whether Key's own negligence demanded a reduction of the damages award. Key cross-appealed, arguing that the trial court erred in excluding evidence of lost future profits as damages. The Court of Appeals affirmed. *Key v. Chrysler Motors Corp.*, 119 N.M. 267, 277, 889 P.2d 875, 885 (Ct.App.) (Hartz, J., dissenting), *cert. granted,* 119 N.M. 311, 889 P.2d 1233 (1995). We granted certiorari to address the first two issues. We conclude that the Act does not afford standing to all prospective franchisees. Therefore, we overrule the Court of Appeals' rationale in granting Key

standing. We also conclude that Key failed to state a cause of action under the Act. Therefore, we vacate the judgment entered in favor of Key and remand with instructions to enter judgment for Chrysler.

### I. BACKGROUND

Because the facts of this case have been fully presented in the Court of Appeals opinion, we will not repeat them except as they are relevant to our discussion of the arguments made to this Court on certiorari. This suit arose out of Chrysler's refusal to approve the transfer of a Chrysler/Plymouth franchise to Key, who already owned and operated a Jeep/Eagle franchise with Chrysler and was seeking to expand the existing business. Key alleges that Chrysler's rejection of his application to acquire the Chrysler/Plymouth franchise violated the Act. Key then sued Chrysler pursuant to the Act.

The Act requires that the manufacturer's "consent [to transfer a franchise] shall not be unreasonably withheld." Section 57–16–5(L). Chrysler rejected Key as a potential franchisee because he failed to meet his Minimum Sales Responsibility (MSR) for the Jeep/Eagle line of vehicles sold under his existing franchise. The MSR is Chrysler's measure of a dealer's sales ability. It is derived from new vehicle registrations within the dealer's sales territory multiplied by a second figure based on Chrysler's sales within a larger sales zone encompassing the dealer's sales territory. The record indicates that in reviewing applications from prospective franchisees who had existing dealerships, Chrysler used a dealer's MSR to evaluate sales performance, but used different criteria for reviewing other prospective franchisees. The trial court found that a dealer's MSR may be a reasonable criterion in evaluating a prospective franchisee; however, in this case local geographic and economic factors distorted its accuracy in evaluating Key's sales performance. The trial court found that fraudulent registration in New Mexico of vehicles owned by Texas residents distorted the number of total new vehicle registrations in Dona Ana County, so that mathematically applying the number of new vehicles regis-

tered in the county into the MSR formula was not representative of Key's true percentage sales. Consequently, the trial court found Key proved that Chrysler's reliance on the inaccurate MSR to reject Key as a potential franchisee was unreasonable and violated Section 57–16–5(L).

The trial court interpreted Section 57–16–5(L) to impose a statutory duty on Chrysler to act reasonably, which included the specific duty to ensure use of an accurate MSR in the subject area. Chrysler had unilateral control over the standards used to select dealers, and as such had the upper hand in the selection process. Thus, the trial court concluded that even if Chrysler's MSR committee did not know about extenuating factors affecting Key's territory, it had a duty to ascertain the MSR's accuracy. The trial court held, and the Court of Appeals majority agreed, that Chrysler's failure to use an accurate MSR to judge Key's application fell below the legal standard required under the statute.

On certiorari Chrysler argues that Key lacked standing to sue under the Act because the Legislature did not intend to provide a cause of action to a prospective franchisee. Chrysler reasons that the Legislature intended to redress the historical imbalance of power between automobile manufacturers and their existing franchisees, and that its overriding purpose of protecting franchisees is clear. Chrysler asks us to conclude that only franchisees holding valid franchises have standing to sue manufacturers under the Act.

Key argues that a plain reading of the Act's declared policy makes it clear that the New Mexico Legislature intended the Act to govern pre-franchise relationships, including conduct pursuant to obtaining a franchise. The Act's declared policy is as follows:

> The distribution and sale of motor vehicles in this state vitally affects the general economy of the state and the public interest and welfare of its citizens. It is the policy of this state and the purpose of this act to exercise the state's police power to ensure a sound system of distributing and selling motor vehicles and regulating the manufacturers, distributors, representatives and dealers of those vehicles to provide for compliance with manufacturer's warranties, and to prevent frauds, unfair practices, discriminations, impositions and other abuses of our citizens.

Section 57–16–1. The Court of Appeals majority agreed with Key's interpretation of the Legislature's intent. *Key*, 119 N.M. at 274, 889 P.2d at 882.

Judge Hartz, however, noted that the Act limits recovery to damages for an injury "by reason of anything forbidden in this act." *Key*, 119 at 279, 889 P.2d at 887 (Hartz, J., dissenting) (discussing Section 57–16–13). He observed that Section 57–16–9 provides as follows:

> Anything to the contrary notwithstanding, *it shall be unlawful for the manufacturer*, distributor or representative *without due cause* to fail to renew on terms then equally available to all its motor vehicle dealers, to terminate a franchise or *to restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation for the value of the business.* (Emphasis added.)

*Id.* at 279, 889 P.2d at 887. Judge Hartz reasoned that Section 57–16–9 precluded a dealer from suing a manufacturer for refusing to transfer the franchise when the dealer had received "fair and reasonable compensation." *Id.*, 119 N.M. at 277–78, 889 P.2d at 885–86. He concluded that Section 57–16–9 eliminated "liability to the proposed transferee ... altogether" when the dealer had received adequate compensation. *Id.* at 280, 889 P.2d at 888. Key neither pleaded nor proved that Borman failed to receive proper compensation. *Id.* at 281, 889 P.2d at 889. Judge Hartz concluded that on these facts Key did not have a cause of action. *Id.*

The majority opinion construed Section 57–16–9 as limiting only the selling dealer's cause of action, and thus as not dispositive of Key's cause of action. *Id.* at 273, 889 P.2d at 881. The majority viewed the remaining issue as whether the trial court erred in holding Chrysler liable "for relying on the inaccurate MSR when it did not actually know the facts rendering the MSR inaccurate." *Id.* at 275, 889 P.2d at 883. The majority concluded that "because Chrysler determined the elements for calculating the MSR and the

formula for measuring dealer's sales performance, Chrysler had an obligation to make reasonable inquiries about whether local conditions rendered the MSR on which it relied inaccurate." *Id.*

Judge Hartz, on the other hand, noted that:

> When Section 57–16–5(L) states that a manufacturer's consent to transfer of a franchise "shall not be unreasonably withheld," it is not imposing a tort standard of "reasonableness." It is saying that the manufacturer's reasons for denial must be sound reasons. It is requiring the manufacturer to make an objectively reasonable business decision. Rather than saying that the manufacturer must act with "due care," it is saying that the manufacturer must act with "due cause." *See* § 57–16–9 (manufacturer cannot restrict the transfer of a franchise "without due cause"). The requirements of "due care" and "due cause" will overlap substantially, but they are not congruent.

*Key,* 119 N.M. at 282, 889 P.2d at 890. Having construed the Act to require the manufacturer to act with "due cause" rather than "due care," Judge Hartz noted that the trial court's findings indicate Chrysler's use of Key's MSR was negligent for lack of an independent investigation. *Id.* at 284–85, 889 P.2d at 892–93. He reasoned that the Court's findings and conclusions did not establish Chrysler had any duty to make an independent investigation. *Id.* at 285, 889 P.2d at 893. He concluded that even if Key had a cause of action under the Act, "it would be appropriate to remand for further findings by the district court." *Id.*

## II. STANDING

We first determine whether there is a significant difference between having standing to sue and having a cause of action under the Act. We conclude that there is not.

■ A cause of action is defined as an "aggregate of operative facts which give rise to a right enforceable in the courts." 2 James W. Moore, *Moore's Federal Practice* ¶ 2.06c, at 2–56 (2d ed. 1995); *Original Ballet Russe v. Ballet Theatre,* 133 F.2d 187, 189 (2d Cir.1943). Similarly, standing is a doctrine requiring that the claimant must have a personal stake in the outcome of a case; the claimant must allege both injury in fact and a traceable causal connection between the claimed injury and the challenged conduct. 12 James W. Moore, *Moore's Federal Practice, supra,* ¶ 300.02[2.—3], at 1–13 to 1–14. Furthermore, a plaintiff seeking to acquire standing under a statute "must demonstrate ... that 'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute.'" *Id.* at 1–16 (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970)). Thus, both doctrines allow plaintiffs to enforce a right in the courts, if it is derived from common law or statute. Whether we ask if Key had standing to sue or whether we ask if the Act provided Key with a cause of action, we must look to the Legislature's intent as expressed in the Act or other relevant authority. *See generally Knauz v. Toyota Motor Sales USA, Inc.,* 720 F.Supp. 1327, 1328–31 (N.D.Ill.1989) (statute's creation of private right does not allow all protected parties to protest all wrongs preserved; causes are tied to specific wrongs against particular classes).

For the following reasons, we conclude that the Act does not grant standing to all prospective franchisees. We conclude that taken as a whole, taking into consideration both its federal counterpart and statutes from other states, the Act cannot be said to afford protection to every prospective purchaser of an automobile franchise. The relevant provisions are neither sufficiently explicit nor are the Act's purposes sufficiently definite to support that result. We overrule the Court of Appeals in its interpretation of the Act to provide such protection. However, we also consider whether Key stated a cause of action under the Act as an existing dealer complaining about actions taken by the franchisor. We conclude Key did not. We explain below.

### A. The Text of the Act and a Preliminary Construction

■ In interpreting statutes, we seek to give effect to the Legislature's intent, and in

determining intent we look to the language used and consider the statute's history and background. *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). Rules of statutory construction dictate that when a statute's language is clear and unambiguous and it conveys a clear and definite meaning, the statute must be given its plain and ordinary meaning. *Draper v. Mountain States Mut. Casualty Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994).

 However, all parts of a statute must be read together to ascertain legislative intent. *Quintana v. New Mexico Dep't of Corrections,* 100 N.M. 224, 225, 668 P.2d 1101, 1102 (1983). We are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole. *General Motors Acceptance Corp. v. Anaya,* 103 N.M. 72, 76, 703 P.2d 169, 173 (1985). "[C]ourts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994); *see also Miller v. New Mexico Dep't of Transp.,* 106 N.M. 253, 255, 741 P.2d 1374, 1376 (1987) ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals."). In this case, taken as a whole and against the background of its federal and state counterparts, the Act "give[s] rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *Helman,* 117 N.M. at 353, 871 P.2d at 1359.

 There are a number of provisions relevant to the standing issues raised on appeal. They include:

It is unlawful for any manufacturer, distributor or representative to:

. . . . .

L. prevent or attempt to prevent by contract or otherwise any motor vehicle dealer or any officer, partner or stockholder of any motor vehicle dealer from selling or transferring any part of the interest of any of them to any other person or party; provided, however, that no dealer, officer, partner or stockholder shall have the right to sell, transfer or assign the franchise or power of management or control thereunder without the consent of the manufacturer, distributor or representative except that *consent shall not be unreasonably withheld* [.]

(Emphasis added.) Section 57–16–5.

The provisions of this act shall apply to *all persons,* manufacturers . . . and dealers and to all written or oral agreements between a manufacturer, distributor or representative with a motor vehicle dealer including, but not limited to, *the franchise offering,* the franchise agreement . . . and all other such agreements in which the manufacturer, distributor or representative has any direct or indirect interest.

(Emphasis added.) Section 57–16–2.

In addition to any other judicial relief, *any person* who shall be injured in his business or property by reason of anything forbidden in this act may sue therefor in the district court and shall recover actual damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . .

(Emphasis added.) Section 57–16–13.

Key is indeed a "person" as described in the Act. Section 57–16–3(C) (" 'person' means every natural person, partnership, corporation, association, trust, estate or any other legal entity"). He sought to acquire an existing Chrysler automobile dealership franchise offered for sale by Borman. Due to the business nature of franchising, a franchise transfer is contingent upon approval by the franchisor, in this case, Chrysler. Therefore, the transaction was clearly a "franchise offering" as used in the Act. Section 57–16–2. However, the Act does not govern manufacturers' dealings with prospective franchisees, nor does it provide in explicit terms protection for that class. New Mexico's Act provides for standing in broad terms, but it links standing to forbidden conduct and articulates forbidden conduct in specific terms. *Compare* § 57–16–13 ("any person . . . injured

... by reason of anything forbidden ... may sue") *with* § 57–16–5 ("unlawful for any manufacturer ... to ...") *and* § 57–16–4 ("unlawful for any dealer to ...").

The Act does not provide any standard against which specific conduct by a manufacturer might be challenged by a prospective franchisee or measured by a court. Read as a whole, the Act regulates the relations between manufacturers and their dealers, and also dealer conduct toward their customers. Proscribed acts on the manufacturers' part include refusing to deliver vehicles within a reasonable time after receipt of the dealer's order; using false or deceptive advertising; discriminating in price between dealers with respect to vehicles and parts; establishing an additional franchise for the same line or make in the area already served; preventing any dealer from changing the capital structure of his dealership; imposing unreasonable restrictions on the dealer in the franchise agreement; terminating a franchise or refusing to renew it without due cause; and preventing the dealer from transferring the franchise without consent, which may not be unreasonably withheld. *See* §§ 57–16–5, –8, –9. Similarly, dealers are prohibited from compelling a new car buyer to purchase "extras"; using false or deceptive advertising; failing to perform warranty service; and selling as new a used car or showroom model. *See* § 57–16–4. None of the Act's provisions proscribe conduct relating to procuring a dealership. Any cause of action by a prospective purchaser under the Act would need to be derived by implication. The basis for such an implication is tenuous.

### B. Comparable Legislation

■ The Act was modeled after its federal counterpart, the Automobile Dealer Suits Against Manufacturers, 15 U.S.C. §§ 1221–1225 (1994), which was enacted by Congress in 1956. *See* H.R. No. 2850, 84th Cong., 2nd Sess. (1956), *reprinted in* 1956 U.S.C.C.A.N. 4596. The federal counterpart protects motor vehicle dealers from injury because of an inequality in their bargaining power relative to automobile manufacturers. *Id.* It is shorter, more narrowly defined, and specifically regulates dealings only between car

dealers and manufacturers. *See* 15 U.S.C. § 1222; *Stansifer v. Chrysler Motors Corp.,* 487 F.2d 59, 63 (9th Cir.1973) ("It is obvious that the Act does not apply until a manufacturer-dealer relationship has been created."); *see also Colonial Ford, Inc. v. Ford Motor Co.* 592 F.2d 1126, 1128 (10th Cir.) (improper and coercive demands made on prospective franchisee prior to formal execution of contract were deemed involved in the franchise in order to provide protection under the federal statute, notwithstanding timing of execution), *certs. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

Unlike its federal counterpart, New Mexico's Act protects consumers, manufacturers, and dealers. *General Motors Acceptance Corp.,* 103 N.M. at 76, 703 P.2d at 173. Given its declared policy, the Act may be thought of both as a "dealer protection act" akin to the federal law and a "consumer protection act." We agree with the Court of Appeals majority that the above-stated policy, coupled with the broad language of Sections 57–16–13 ("person") and 57–16–2 ("franchise offering"), evinces a legislative intent to make remedies available to a wide range of potential plaintiffs. *Key,* 119 N.M. at 271, 889 P.2d at 879. Nevertheless, we do not believe that the Act's provisions provide unlimited standing to prospective franchisees.

In several other jurisdictions courts have denied standing to prospective purchasers of automobile franchises. *See Statewide Rent-A-Car, Inc. v. Subaru of Am.,* 704 F.Supp. 183, 184–85 (D.Mont.1988); *Knauz,* 720 F.Supp. at 1328–31; *Beard Motors, Inc. v. Toyota Motor Distrib., Inc.,* 395 Mass. 428, 480 N.E.2d 303, 305–07 (1985); *Roberts v. General Motors Corp.,* 138 N.H. 532, 643 A.2d 956, 958–60 (1994); *Tynan v. General Motors Corp.,* 248 N.J.Super. 654, 591 A.2d 1024, 1027–31, *certification denied,* 127 N.J. 548, 606 A.2d 362 (1991), *modified on other grounds,* 127 N.J. 269, 604 A.2d 99 (1992) (per curiam). The Court of Appeals majority concluded that other states' statutes involve standing provisions containing more limiting language than New Mexico's, thus lessening the instructive value of these statutes and the cases interpreting them. *Key,* 119 N.M. at 272, 889 P.2d at 880. We agree.

In Illinois, Massachusetts, Montana, and New Jersey, statutory provisions characterize the right of action as belonging to franchisees or motor vehicle dealers. *See* 815 Ill. Comp.Stat. 710/13 (Smith–Hurd 1994); Mass. Ann.Laws ch. 93B, § 12A (Law.Co-op.1994); Mont.Code Ann. § 61–4–210 (1995); N.J.Stat.Ann. § 56:10–29 (West 1989). Thus, in these states, the Legislature appears to have limited the cause of action to existing franchises.

The New Hampshire Supreme Court, construing a statute that granted a right of action to "any person so injured," denied standing on the ground that the plaintiff's injury was not within the Legislature's intent in drafting the statutes. *Roberts,* 643 A.2d at 960 (the claim based on the Dealership Act was properly dismissed for lack of standing). The court specifically noted that "[t]he clear intent of the non-consumer-oriented provisions is to protect the investment and property interests of those who are already dealers." *Id.* 643 A.2d at 959. On the other hand, comparable legislation in Florida grants a right of action to "any person." Fla.Stat. ch. 320.697 (1993). Additionally, the Florida Act specifically addresses the prospective franchisee of a franchise. *See* Fla.Stat. ch. 320.643 (1993). Accordingly, the federal court, interpreting the Florida statute, granted a prospective franchisee standing. *See Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz of N. Am., Inc.,* 32 F.3d 528, 531 (11th Cir.1994), *cert. denied,* — U.S. ——, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). Similarly, in Pennsylvania the federal district court granted standing to the plaintiff based upon a statutory right conferred to "any person." 63 Pa. Cons.Stat.Ann. § 818.20 (Supp.Pamp.1995); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1382–83 (3rd Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

We conclude that comparable legislation provides no conclusive answer and only uncertain direction. We next review more inclusive legislation.

### C. More Inclusive Legislation

The National Conference of Commissioners on Uniform State Laws (NCCUSL) ap-proved a uniform law in the field of franchising in 1987. *See* The Uniform Franchise and Business Opportunities Act, 7A ULA, at 115 (1995 Cum.Ann.Pocket Part).

The NCCUSL Drafting Committee worked to construct an act that balances the interests of franchisors, franchisees, and the public—an act that provides sensible law for franchising arrangements. . . . Current law, in many instances, misses a fair balance between the interests of franchisor and franchisee and often ignores altogether the interests of consumers, other franchisees in the particular franchise system, or prospective franchisees in that system.

*Id.,* Prefatory Note, at 116. The Uniform Act codifies certain minimum standards of conduct, governs franchise sales practices, and provides both a private remedy and a public investigatory and enforcement power. Section 201 of the Uniform Act provides a duty of good faith, requiring "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Id.* at 125. No state has yet adopted the Uniform Act; however, the Uniform Act reflects a growing body of state statutory law.

Some states have enacted legislation relating to franchises to address issues originating in the imbalance of power between franchisor and franchisee that are not limited to automobile dealerships. *See, e.g.,* 16 C.F.R. §§ 436.1, .2, .3 (1994); Haw.Rev.Stat. § 482E–1 et seq. (1993); 815 Ill.Comp.Stat. 705/1–44 (Smith–Hurd 1994); Mich.Comp. Laws Ann. § 445.1501 et seq. (West 1989); Minn.Stat. § 80C.01 et seq. (1994); N.Y.Gen. Bus.Law §§ 680, 683 (Consol.1994); N.D.Cent.Code § 51–19–08 (1989); S.D.Codified Laws Ann. §§ 37–5A–16 to –28 (1994). Recognizing that franchisors and franchisees have unequal bargaining power, *see generally* Mark Pruitt, *Disclosure and Good Cause Legislation: "Where's the Beef" in Franchise Regulation?,* 90 Com.L.J. 563 (1985) (imbalance of power is informational in character before franchise sales and it becomes an imbalance of contractual control once the agreements have been consummated), these enactments attempt to protect a franchisee's investment by holding franchisors to a stan-

dard of fair practice and good-faith dealings. *Id.* at 565. Sample requirements in the various statutes include (1) requiring franchisors to register with the appropriate state agency before selling a franchise in order to grant equal notice to members of the public for purchase options and to prevent unfair competition, *see, e.g.,* Minn.Stat. § 80C.02; (2) requiring franchisors to completely disclose all information necessary to permit prospective franchisees to make informed decisions prior to purchase, *see, e.g., id.* at § 80C.06; and (3) prohibiting franchisors from terminating the franchise business without good cause, thereby protecting the franchisee's business investments, *see, e.g., id.* at § 80C.13 (Subd. 3).

California has a comprehensive enactment governing franchises; its Franchise Investment Law governs prepurchase actions culminating in formation of a franchise, while its Franchise Relations Act governs dealings after purchase. *See* Cal.Corp.Code §§ 31000 to 31019 (West 1977 & Cum.1995) *and* Cal. Bus. and Prof.Code §§ 20000 to 20043 (West 1987 & Cum.1995). As the California Legislature noted:

> It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship.

Cal.Corp.Code § 31001.

We note that New Mexico does have a Franchise Termination Act. NMSA 1978, §§ 57–23–1 to –8 (Repl.Pamp.1995). However, its purpose is extremely limited. The Franchise Termination Act primarily ensures that franchisees/dealers of "farm tractors, farm implements, utility tractors, industrial tractors, attachments and repair parts," § 57–23–2(E), are reimbursed by franchisors/manufacturers for their leftover inventory and outstanding warranty claims upon the termination of a franchise relationship.

We conclude that the law of franchising is developing within a wide range of statutory schemes. Sometimes legislatures have targeted particular types of franchises; more recently, there have been efforts to provide a more integrated approach to common problems. We can detect no general public policy that supports a particular construction of the New Mexico Act's standing provisions. However, we note that the more inclusive legislation does not yet reveal any trend toward greater statutory recognition of a prospective franchisee's right to acquire a franchise. This fact suggests that the Act probably was not intended to protect such a right.

### D. Key's Cause of Action

■ After considering the variety of statutory approaches implemented in other jurisdictions, we conclude that New Mexico's Act does not support a conclusion that the Legislature intended to allow prospective franchisees to recover damages for loss of a prospective franchise. *Cf.* N.J.Stat.Ann. § 56:10–29 ("A motor vehicle franchisee may bring an action against the motor vehicle franchisor which has granted its franchise, or any other person ... to enjoin any violation of this act and to recover, where appropriate, any damages sustained by the franchisee as a result of a violation of this act."). Without more explicit textual support, we cannot conclude that the Act affords a right of relief to every person wishing to acquire an automobile dealership. *See generally* 1 Gladys Glickman, *Franchising* § 4.03[1] (1995) (franchisors ordinarily are limited only by antidiscrimination and antitrust laws in selecting franchisees and rejecting potential franchisees). Such plaintiffs may seek relief under common-law remedies such as tortious interference with prospective or existing economic relationships. *See* 4 Restatement (Second) of Torts § 766 (1979). In the tort of intentional interference with a prospective advantage, the basis for the imposition of liability requires proof of improper motive (intent to harm) or utilization of some improper means. *See M & M Rental Tools, Inc. v. Milchem,*

*Inc.,* 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980); *see also Anderson v. Dairyland Ins. Co.,* 97 N.M. 155, 159, 637 P.2d 837, 841 (1981) (adopting Restatement (Second) of Torts approach requiring improper motive or improper means in order to establish liability). Thus, even in the absence of a right of action under the Act, a prospective purchaser may recover if he or she can prove the existence of a malicious motive.

 Nor can we recognize a cause of action in Key based solely on his existing status as a dealer or franchisee. If the statute were interpreted literally, Key's status as a dealer would support his standing to sue, but that result would mean the Legislature had distinguished existing dealers from those who were in any other kind of business. Such a distinction seems to be an unlikely legislative choice. *See Knauz,* 720 F.Supp. at 1327 (Illinois statute held not applicable to a dealer applicant who already had a franchise from another manufacturer); *Beard,* 480 N.E.2d at 306 (describing as "illogical" the result of granting a prospective purchaser of a motor vehicle dealership standing to sue only if it was already a dealer at the time of the prospective sale).

However, Key is an existing franchisee of Chrysler. As such, he is within the group whose bargaining power the Legislature sought to enhance. It is possible to view Key's complaint as alleging that the Act forbids a manufacturer from foreclosing an opportunity to acquire a franchise by unreasonably withholding consent to a proposed transfer. We have construed the Act more narrowly than did the Court of Appeals, and thus we conclude that Key's complaint fails to state a cause of action. It is equally possible to read his complaint as alleging that the Act forbids a manufacturer from employing a sales quota that fails to measure a dealer's performance fairly and accurately, that Chrysler used such a sales quota, and that Key's damages consist of the lost business opportunity. As a result, he lost an opportunity to expand his existing franchise by acquiring an additional franchise from that franchisor. So read, the gist of Key's complaint would be that his franchisor misinterpreted his sales record and inaccurately characterized his performance as a dealer. Under such a reading, the lost potential franchise is a measure of the harm suffered rather than a matter of substantive right. The matter of substantive right is the propriety under the Act of Chrysler's conduct toward its franchisee. If we were to construe Key's complaint in that fashion, however, we run into the difficulty that the legislation New Mexico has adopted does not provide, as does the Uniform Act, a general duty of good faith. Rather, the Act specifically identifies particular conduct on the part of the franchisor toward its franchisee as forbidden. In order to construe Key's complaint as stating a · cause of action under the Act, we believe that we would need at least the statement of a general duty, as provided in the Uniform Act, or specific language directed at the franchisor's choice of service and performance standards. We have neither.

By expanding the definition of injury in business or property to include a lost opportunity to acquire an additional franchise from one's own franchisor, we would not significantly modify the existing common law. Prosser points out that the expectancies most often protected are those of future contractual relations. *See* W. Page Keeton et al., *Prosser and Keeton on Torts* § 130, at 1005 (5th ed. 1984), "Interference with Prospective Advantage." Also, loss of profits is a familiar element of damages in breach of contract cases. It is when an attempt has been made to carry liability for interference beyond the commercial context, and into such areas as exclusion from social organizations or deprivation of the chance of winning a contest, that courts have felt that they were "embarking upon uncharted seas." *Id.* at 1006. By recognizing Key's status as an existing dealer seeking to purchase an existing franchise from its franchisor, we would advance the Legislature's purpose in protecting dealers. Nevertheless, under the current statutory scheme, we cannot say that Chrysler has engaged in prohibited conduct. Our statute lacks sufficient general or specific language to support a determination that Key's complaint states a cause of action under the Act. We illustrate by comparing different provisions regarding termination.

Franchise dealer acts commonly provide that a manufacturer may not terminate or refuse to renew a franchise without due cause. *See, e.g.,* § 57–16–9. Often a valid ground for termination occurs when a franchisee fails to meet the sales quotas established by the franchise agreement. *See* 62B Am.Jur.2d *Private Franchise Contracts* § 598 (1990). Courts called upon to determine whether a franchisor has acted inappropriately inquire into whether the sales quota is "fair and reasonable, objective and nondiscriminatory, and not arbitrary and capricious, or coercive." *Id.* (footnotes omitted). Additionally, quotas need to be applied uniformly to all franchisees, taking into account local conditions, because failure to meet quotas may be attributed to economic or market factors beyond the franchisee's control. *Id.; Swartz v. Chrysler Motors Corp.,* 297 F.Supp. 834, 838 (D.N.J.1969) (sales quota incorporated in franchise agreement held invalid for failure to take local conditions into account).

The New Hampshire legislature has defined good cause for purposes of termination to include a failure to comply with a term of the franchise. N.H.Rev.Stat.Annot. § 357–C:7(II) (1995). The legislature dealt with a failure in sales or service performance as follows:

(b) If the failure by the new motor vehicle dealer, in subparagraph (a), relates to his performance in sales or service, then good cause, as used in subparagraph I(c), shall be defined as the failure of the new motor vehicle dealer to effectively carry out the performance provisions of the franchise if:

(1) The new motor vehicle dealer was apprised by the manufacturer in writing of such failure, the notification stated that notice was provided of failure of performance pursuant to this law, and the new motor vehicle dealer was afforded a reasonable opportunity to exert good faith efforts to correct his failures;

(2) Such failure thereafter continued within the period which began not more than 180 days before the date notification of termination, cancellation, or non-renewal was given pursuant to paragraph V; and

(3) The new motor vehicle dealer has not substantially complied with reasonable performance criteria established by the manufacturer and communicated to the dealer. Among those factors determining performance criteria shall be the relevancy of the manufacturer's sales within the state and the particular market area.

Section 357–C:7(II)(b).

We believe that the Act affords Key particular protection based on his existing and ongoing relationship with Chrysler. We do not construe Key's complaint as stating a cause of action based on the particular protection provided that relationship by the Act. We are not able to equate wrongful termination, against which the Act provides specific protection, with the loss of an opportunity to acquire an additional franchise. The Act does not define "due cause" as it relates to termination. Absent a definition such as that provided by New Hampshire, we would be imposing on Chrysler obligations of which it had no notice. *Cf. Brewer v. Exxon Corp.,* 626 F.Supp. 76, 80 (E.D.Tenn.1985) (because statute purported to restrict existing contractual rights, it was not entitled to a broader construction than was clearly warranted by its terms). We next address the effect of Section 57–16–9 on any cause of action by a selling dealer against its franchisor on the basis that the franchisor unreasonably withheld consent to a proposed transfer.

### III. SECTION 57–16–9 AND ITS EFFECT ON A DEALER'S STATUTORY CAUSE OF ACTION

Anything to the contrary notwithstanding, it shall be unlawful for the manufacturer, distributor or representative without due cause to fail to renew on terms then equally available to all its motor vehicle dealers, to terminate a franchise or to restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation for the value of the business.

Section 57–16–9.

The Court of Appeals majority construed Section 57–16–9 as applying to restrict the

selling dealer from bringing an action if it has received fair and reasonable compensation despite the manufacturer's unlawful behavior. *Key,* 119 N.M. at 273, 889 P.2d at 881 ("we conclude that Section 57–16–9 more reasonably applies only to restrict the existing dealership itself, thus preventing the existing dealer from bringing an action despite the manufacturer's unlawful behavior, so long as the dealer has received fair and reasonable compensation."). According to the majority, the provision limits only the existing dealer. We address this issue for two reasons.

First, both Key and Amicus New Mexico Automotive Dealers Association (Dealers Association) contend that Section 57–16–9 does not turn a manufacturer's forbidden conduct into lawful conduct because the dealer received fair compensation. According to them, Section 57–16–9 should be interpreted to provide that even if a manufacturer's conduct is otherwise permitted under this Act, it is unlawful for a manufacturer to terminate, fail to renew, or refuse transfer of a franchise if the dealer does not receive fair compensation. They contend that when a dealership is *lawfully terminated,* and the seller *also receives fair and reasonable compensation,* then the dealer would not have a cause of action. In effect, they suggest that Section 57–16–9 makes certain conduct unlawful in addition to that conduct defined as unlawful elsewhere in the Act.

The provision found in Section 57–16–9, that a failure "to renew on terms then equally available to all its motor vehicle dealers," does not appear elsewhere in the Act. If Section 57–16–9 stopped after that provision, its effect would be clear. That is, anything to the contrary notwithstanding, it would be unlawful for the manufacturer, without due cause, to fail to renew a franchise on terms then equally available to other dealers. However, when the provision regarding "without due cause" is read in connection with the language that follows regarding termination and restrictions on transfer, the Act's later provisions become self-contradictory. Termination of the franchise without due cause is already unlawful under Section 57–16–5(F); unreasonably withholding consent to transfer the franchise and unreasonable restrictions on transfer are already unlawful under Sections 57–16–5(L) and –8. Thus, there is "nothing to the contrary" to which the first phrase of the provision applies. In his dissent, Judge Hartz suggested that Section 57–16–9 sets a limit on damages, excludes consequential damages that the dealer may recover, and eliminates liability to a proposed transferee altogether. *Key,* 119 N.M. at 280, 889 P.2d at 888. However, as the Dealers Association's argument illustrates, this construction of the statute limits the protection provided to the core group the Act seeks to protect. We address this issue because it has been central to the arguments made to the Court of Appeals and to us, and because our resolution of the issue supports a conclusion that Key lacks standing and has failed to state a cause of action under the Act.

Another way to read the statute is to limit the qualification of "without due cause" to the immediate phrase in which it appears. For example:

Anything to the contrary notwithstanding, it shall be unlawful for the manufacturer, distributor or representative without due cause to fail to renew on terms then equally available to all its motor vehicle dealers, [or even with due cause] to terminate a franchise or to restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation for the value of the business.

Section 57–16–9. This interpretation would mean that (1) the manufacturer must have due cause not to renew on terms equally available to other dealers, and (2) the manufacturer may be required to provide compensation to dealers when the franchise is terminated, or when consent to transfer is denied, even when the manufacturer has reasonable grounds to support his actions. This construction is similar to the interpretation argued by the Dealers Association.

The New Hampshire Act has a provision that requires compensation for the dealer in the event of a good-faith termination for good cause. *See* N.H.Rev.Stat.Annot. § 357–C:7(VI). The New Hampshire Act requires payments for the dealer's inventory, supplies,

and even the dealership facilities or the dealer's lease payments for a year. Section 357–C:7(VI), (VII). This is similar to the position advanced by Amicus that New Mexico's Section 57–16–9 is an additional requirement.

We conclude that Section 57–16–9 was intended to forbid conduct that is otherwise lawful under the Act. This interpretation is more consistent with the Act's intent than any of the other interpretations of Section 57–16–9 that have yet been advanced. Such conduct might include, for example, exercise of a franchisor's legitimate interest for an improper purpose or in an unreasonable manner. *Cf. Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 696 (5th Cir.1975) (franchisor has right to restrict price its franchisee may seek for the franchise to reasonable value "in order to insure that the purchaser will have a chance to realize a reasonable return on his investment."), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Frank Coulson, Inc.–Buick v. General Motors Corp.*, 488 F.2d 202, 207 (5th Cir.1974) (automobile manufacturer's interest in insuring that automobile dealers are financially sound does not encompass an absolute privilege to limit a dealer's price for sale of dealership). So construed, Section 57–16–9 in itself would not preclude a cause of action on these facts. To the extent that the Court of Appeals majority opinion might be read to permit otherwise proscribed conduct under the Act upon fair and reasonable compensation to the selling dealer, it is overruled. However, so construed, Section 57–16–9 is further evidence of a legislative purpose that integrates the various provisions of the Act. Section 57–16–9 balances the interests of dealers and manufacturers; it may in fact stem from fact patterns such as *Kestenbaum v. Falstaff Brewing Corp.* and *Frank Coulson, Inc.*, in which courts were required to balance the competing interests of the manufacturer and its dealer in a proposed transfer. Section 57–16–9 reinforces our conclusion that the Act was intended to redress particular consequences of the inequality of bargaining power between manufacturers and dealers.

We next examine the relevant standard for evaluating refusal to consent. We do so for reasons similar to the reasons we have construed Section 57–16–9. The parties have devoted considerable time and energy to the issue, and we conclude that resolution of this issue supports our conclusion that Key lacks standing and has failed to state a cause of action under the Act.

## IV. THE RELEVANT STANDARD FOR EVALUATING REFUSAL TO CONSENT

The Act does not provide specific guidelines to define a reasonable standard; it merely requires that a manufacturer may not unreasonably withhold consent to a franchise transfer. Section 57–16–5(L). *Cf.* Fla.Stat. ch. 320.643 (establishing a *presumption* of unreasonableness if a manufacturer withholds consent from a franchisee who is of good moral character and meets uniformly-applied standards or qualifications). Amicus for the Manufacturers Association have urged this Court to interpret the term "unreasonable" as requiring a showing of bad faith or some unlawful motive. Absent express legislative intent, we do not read into the statute a standard higher than "reasonable." That would make a cause of action under the Act the equivalent of the common-law action Key might have brought, but did not.

Chrysler argues that the appropriate legal standard should have been whether, based upon the facts known at the time the decision to withhold consent to the transfer was made, a reasonable person could have concluded that Key was materially deficient with respect to one or more of the appropriate, performance-related criteria Chrysler uses to evaluate franchise transfers. Chrysler claims that it was unaware of local conditions that rendered its MSR inaccurate, and thus should not be held accountable for facts of which it did not know and was not made aware.

We understand Chrysler's argument as follows. The trial court and the Court of Appeals applied the wrong legal standard, and under the correct legal standard, there was insufficient evidence as a matter of law to support a verdict for Key. We agree with part of Chrysler's argument. We believe the

trial court may not have applied the correct legal standard. However, we also believe there was evidence to support recovery under the correct standard, had the Legislature authorized Key to bring a cause of action as a prospective franchisee or had Key been the selling dealer.

We construe the Act to require the manufacturer to act with due cause. *See* § 57–16–9 (manufacturer cannot restrict the transfer of a franchise "without due cause"). "In particular, the due-cause formulation more clearly indicates that the manufacturer need not undertake any independent investigation to determine whether the applicant for the franchise is qualified." *Key,* 119 N.M. at 282, 889 P.2d at 890 (Hartz, J., dissenting). Although the Legislature might have imposed such an obligation, it has not. *See* Jerome L. Withered, *The No–Assignment-without-Consent Clause in Franchise Agreements,* 4 Franchise L.J., 1, 18–19 (1984) (in light of the consequences to the franchisee of a wrongful denial of consent to transfer, it does not seem unfair and should not create an undue burden upon the franchisor to require it to take reasonable investigative steps to corroborate derogatory information upon which it relies in denying consent to transfer the franchise).

We also construe due cause as establishing an objective standard, consistent with that adopted in *Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 766 P.2d 280 (1988), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989). What was required of Pennzoil in *Kestenbaum v. Pennzoil Co.* was fact-specific and turned on the contract of employment. There Kestenbaum proved that he was entitled to be treated fairly, have the opportunity to know some specifics of the charges against him, be given a chance to defend himself, and his supervisors could not determine whether there was just cause for the termination until hearing and fairly considering Kestenbaum's side of the story. *Id.* at 22, 766 P.2d at 282. Pennzoil's liability did not turn on a duty to investigate, but rather on its blind reliance on an inadequate summary of an investigation that had been negligently undertaken. The test established in *Kestenbaum v. Pennzoil Co.* was whether Pennzoil had reasonable grounds to believe that sufficient cause existed to justify discharging Kestenbaum from its employment. *Id.* at 27, 766 P.2d at 287. That test is one of objective reasonableness at the time Pennzoil acted, not on evidence adduced at trial as to whether grounds did or did not in fact exist.

By analogy to *Kestenbaum v. Pennzoil Co.,* the reasonableness of Chrysler's refusal to consent depended upon whether Chrysler should have investigated further into the circumstances underlying the MSR. The trial court's findings of fact that Chrysler relied on an inaccurate MSR do not support its conclusion that Chrysler's withholding of consent to Borman's proposed transfer was unreasonable. The Act requires only that Chrysler had reasonable grounds to believe that the MSR data upon which it acted was sufficient to justify its withholding of consent to the transfer. Whether, under the circumstances, including its own relationship to Key and its knowledge of the sales figures of other dealers in the relevant area, Chrysler should have investigated the reliability of the reported MSR data is a determinative question of fact not addressed by the trial court.

The evidence might have supported different findings. That is, for example, it might have been unreasonable on these facts to emphasize the index. Key's complaint alleges other facts indicative of a successful sales record and a satisfactory relationship with the franchisor. Under these circumstances, Chrysler might have acted unreasonably when it did not give Key an opportunity to comment, explain, or justify his sales record. However, the Act seems to us, read as a whole, to require the franchisor's consent as a protection for the manufacturer and to require that consent not be unreasonably withheld, as a protection for the selling dealer. So read, the Act does not appear to have imposed either requirement for Key's benefit. We conclude that Key lacks standing to challenge Chrysler's action, and he has not stated a cause of action under any other provision. Because Key lacks standing as a prospective franchisor and has not stated a cause of action as a franchisee, further proceedings are not necessary. Therefore, we need not remand to permit the trial court to enter amended findings and conclusions on

the basis of an objective standard of due cause for Chrysler's actions.

## V. CONCLUSION

Despite the fact that most of the Act's provisions directly govern situations between car manufacturers, dealers, and consumers, the Act's application to "all persons" and including "franchise offering" indicates the Legislature's intent to provide greater protection for New Mexico citizens. *See* § 57–16–2. Thus, the New Mexico Act is broader in scope than the federal act, and we are not persuaded that the federal act provides an adequate basis to exclude Key's claim. However, statutes from other states provide a basis for concluding that the Act contains an ambiguity. We resolve the ambiguity against the broad principle that the Act provides standing to every prospective franchisee, or grants every prospective franchisee a cause of action for a manufacturer's unreasonable refusal to consent to a franchise transfer to that prospective franchisee. In requiring reasonableness of the manufacturer but precluding transfer without consent, we conclude that the Act balances the interests of manufacturers and dealers. We further conclude that the Act is not specific enough to support the cause of action Key pled on any other basis. We disagree with the Court of Appeals majority that Section 57–16–9 permits otherwise proscribed conduct under the Act upon fair and reasonable compensation to the selling dealer. *Key,* 119 N.M. at 273, 889 P.2d at 881. We believe the trial court applied an incorrect standard in evaluating Chrysler's conduct and determining that it was forbidden, but we conclude that Key has not shown the requisite injury. *See* § 57–16–13 (right of action; damages). We are not persuaded that New Mexico's Act supports Key's claim as a Chrysler dealer whose existing performance was the basis of Chrysler's refusal to consent to his acquisition of an additional franchise. Thus, we reverse the decision of the Court of Appeals, vacate the judgment of the trial court, and remand with instructions to enter judgment for Chrysler. No appellate costs are awarded.

**IT IS SO ORDERED.**

FROST, C.J., and BACA and FRANCHINI, JJ., concur.

RANSOM, J., specially concurs.

RANSOM, Justice (specially concurring).

I concur in the majority opinion except for the discussion under Part III as to the effect of Section 57–16–9. This discussion admittedly is not dispositive and purportedly only "supports a conclusion that [a prospective transferee] lacks standing." I do not agree that the qualification of "without due cause" necessarily is to be limited only to the immediate phrase in which it appears. That is, I do not agree we should decide if it is unlawful with or without due cause for the manufacturer to terminate a franchise or restrict the transfer of a franchise unless the dealer shall receive fair and reasonable compensation.

The majority's interpretation runs contrary to the structure of the sentence which reads that "it shall be unlawful for the manufacturer ... without due cause to fail to renew ..., to terminate ... or to restrict." The statute does not say "it shall be unlawful to fail to renew without due cause," thereby bringing into play "the rule of the last antecedent." Both the phrase "without due cause" and the clause "unless the dealer shall receive fair and reasonable compensation" appear to me to apply to each of the three listed acts—to fail to renew, to terminate, or to restrict. No argument has been advanced that the fair and reasonable compensation clause applies only to restrictions on transfer to the exclusion of a failure to renew or to a termination. In fact, the interpretation adopted by the majority was urged by none of the parties or amici in this case.

We should await the case in which a franchisor or franchisee presents to us a dispositive issue, properly raised, briefed, and argued, regarding whether a franchisor may restrict a transfer *even with due cause* only by paying compensation—notwithstanding Section 57–16–5(L) that requires the franchisor's consent to a transfer, "except that consent shall not be unreasonably withheld."