966 P.2d 191 (1998)
126 N.M. 24
1998-NMCA-159
In the Matter of the ESTATE OF Jan Michelle KEROUAC, deceased.
Gerald NICOSIA as Literary Personal Representative, Appellant,
v.
John LASH as General Personal Representative, Appellee.
No. 18,495.
Court of Appeals of New Mexico.
September 11, 1998.
Certiorari Granted October 28, 1998.
*192 Jerome N. Field, Jerome N. Field, Inc., San Francisco, CA, John S. Campbell, Wiggins, Campbell & Wells, P.A., Albuquerque, NM, for appellant.
Rodney L. Schlagel, Sherrill K. Filter, Emily A. Franke, Butt, Thornton & Baehr, P.C., Albuquerque, NM, for appellee.

OPINION
WECHSLER, J.
{1} This case poses the issue of interpreting the first codicil to a will to determine whether the general personal representative or the literary personal representative of the estate of Jan Michele Kerouac (Decedent) has the authority to make decisions regarding pending litigation involving a separate will contest at the time of Decedent's death. As part of an informal probate proceeding, the district court entered an order interpreting the first codicil determining that the general personal representative holds the authority to make decisions regarding the pending litigation, but authorized a stay pending appeal by the literary personal representative. For the reasons discussed below, we affirm the district court's decision.

Facts
{2} Decedent died in June 1996 in New Mexico. Her will contained a first codicil executed on June 28, 1995, replacing the paragraphs discussing the role of the personal representative in her will executed in January 1994 and otherwise adopting the will. The first codicil states in pertinent part:

SEVENTH: I appoint JOHN LASH as General Executor of this Will for all purposes save those concerning any rights that I now possess or may hereafter possess in any literary works or literary archival materials, including but not limited to any literary works or literary materials of my father, JACK KEROUAC, and my own literary works and materials, including but not limited to Baby Driver and Train Song. As to these literary works and materials, I appoint GERALD NICOSIA as Literary Executor. In his capacity as Literary Executor, he shall make all decisions regarding the appropriate publication, republication, sale, license or any other exploitation of any nature of any intellectual property rights I have in any literary works or materials. He shall do these things with due regard to fostering economic return without devaluing or cheapening the literary works or any intellectual property rights flowing therefrom, or in any way reflecting negatively on me, my father, or my heirs or beneficiaries. In return for his services as Literary Executor, GERALD NICOSIA shall receive as compensation 10% (ten-percent) of any income generated by any publications, sales or other licensing arrangements that he has negotiated, payable to him at receipt of any such income by the estate. Such 10% shall be paid directly by the publisher, purchaser or licensee to the Literary Executor whenever possible. In the event of the predecease of JOHN LASH or in the event that he is unable for any reason or declines to act as General Executor as defined herein, then I nominate and appoint MAXINE BOWERS. my sister-in-law, as General Executrix of this Will, with the same power, rights, discretions, obligations and immunities. No bond shall be required of any Executor appointed in this Will; none of the Executors nominated in this Will shall be personally liable for any loss or damage in connection with the administration of my estate, except in the case of willful misconduct or gross negligence.
....

EIGHTH: I authorize my General Executor to sell at either public or private sale, with or without notice, any non-literary property belonging to my estate and to *193 invest any surplus monies subject only to any confirmation required by law.
{3} At the time of her early death, Decedent was involved in a will contest regarding the probate of her grandmother's will in Florida. Decedent was the daughter of the late author Jack Kerouac, and his second wife, Joan Haverty. When Jack died in 1969, his third wife, Stella Sampas, took a dower's share (one-third interest) and his mother, Gabrielle Kerouac, received the remaining two-thirds of his estate. When Gabrielle passed away in 1973 in Florida, the terms of her will left all of Jack's personal property to Sampas. Sampas died in Florida in 1990 leaving her property, including the property she received from Gabrielle's estate, to her relatives.
{4} Decedent did not receive notice of either of these probate proceedings. After she learned of Gabrielle's will, she commenced an action in Florida state court on May 16, 1994, seeking to revoke the probate of Gabrielle's will alleging that the will was a forgery. This action had not been resolved at the time of Decedent's death and is still pending. If Gabrielle's will is determined to have been a forgery, Decedent's estate and Paul Blake Jr., Gabrielle's other grandchild, or his heirs, would inherit the estate through intestacy. The estate includes certain rights to some of Jack Kerouac's literary works. After Decedent's death, John Lash, acting as the general personal representative of Decedent's estate, reached an agreement with the heirs of Sampas to confidentially settle and dismiss the litigation involving Gabrielle's will.
{5} During a status conference before the Florida court, Gerald Nicosia, the acting literary personal representative, opposed dismissal of the litigation. The judge expressed concerns about the respective authority of the general personal representative and the literary personal representative. The Florida court subsequently entered an order staying the litigation before it, pending a determination by the New Mexico state courts as to the authority of each representative.
{6} The general personal representative then filed a motion in New Mexico state court to interpret the codicil and determine his authority as the general personal representative. Following briefing and a hearing, the district court entered an order granting the general personal representative the authority to control the litigation in Florida. The literary personal representative appeals from this order.

Discussion
{7} Despite the apparent complexity of the litigation, the issue to be resolved in this case is straightforwardwhether the interpretation of Decedent's first codicil authorizes the general personal representative or the literary personal representative to make decisions regarding the Florida litigation.
{8} Initially, we note that while the will and codicil use the term "executor," our Uniform Probate Code recognizes the term "personal representative," but also includes "executor" in its definition. See NMSA 1978, § 45-1-201(A)(34) (1995). Since New Mexico uses the term "personal representative," we will use that term in our discussion. Additionally, the Uniform Probate Code does not expressly provide for the appointment of a literary personal representative, see NMSA 1978, §§ 45-3-701 to -721 (1975, as amended through 1995), and no New Mexico case law exists recognizing a literary personal representative.
{9} However, we liberally construe the Uniform Probate Code to meet its policies, which include effectuating the intent of the decedent. See NMSA 1978, § 45-1-102 (1975); see also In re Estate of Romero, 115 N.M. 85, 88, 847 P.2d 319, 322 (Ct.App.1993) (a decedent may dispose of her property as she sees fit, unless such a disposition is illegal or violates public policy). The function of a literary personal representative has been recognized by other courts and authorities. See In re Bartlett's Estate, 198 Misc. 1000, 101 N.Y.S.2d 675, 676 (Sup.Ct.1950); Cym H. Lowell & Terry R. Abel, Estate Planning for the Instantly Wealthy Including Resident and Non-Resident Aliens, 23 Univ. of Miami Inst. on Estate Planning ¶ 1602.5, at 16-16 (1989). Although not directly applicable here, the Uniform Probate Code does recognize the use of co-representatives to act jointly *194 when so appointed. See § 45-3-717. We see no reason not to recognize, nor do the parties oppose, use of a literary personal representative.
{10} The fact that the parties agree that the first codicil is clear and unambiguous is significant. Interpretation of an unambiguous will or codicil is a question of law, to be reviewed de novo. See Portales Nat'l Bank v. Bellin, 98 N.M. 113, 117, 645 P.2d 986, 990 (Ct.App.1982). In interpreting an unambiguous will, the long-standing rule is that "the court must attempt to give effect to the testator's intent." In re Estate of Bowles, 107 N.M. 739, 740, 764 P.2d 510, 511 (Ct.App.1988). Instead, the literary personal representative argues that we should not only examine the language of the document to determine the testator's intent, but also the surrounding circumstances. This argument is contrary to well-established New Mexico law that intent is to be ascertained from the four corners of the will. See Portales Nat'l Bank, 98 N.M. at 117, 645 P.2d at 990 ("Where a will is unambiguous, extrinsic evidence is not admissible to vary, contradict or supplement the language of a will, or to give a different intention on the part of the testator from that stated in the will itself."); In re Estate of Cruse, 103 N.M. 539, 541, 710 P.2d 733, 735 (1985); Brown v. Brown, 53 N.M. 379, 387, 208 P.2d 1081, 1086 (1949).
{11} The first codicil can be read very plainly to give the literary personal representative control over literary works that Decedent possessed or may come to possess. It states that the literary personal representative is to have control and manage "any rights that I now possess or may hereafter possess in any literary works" of Decedent or her father. This statement is understandable in light of the Florida litigation. See Levenson v. Mobley, 106 N.M. 399, 403, 744 P.2d 174, 178 (1987) (in order to determine if a written instrument is free from ambiguity, court may consider circumstances surrounding execution of the instrument). Decedent knew at the time she prepared the first codicil that she had commenced the Florida litigation. She signed the first codicil on June 28, 1995, eleven months after she filed the Florida action. The first codicil appoints the literary personal representative to "make all decisions regarding the appropriate publication, republication, sale, license or any other exploitation" of rights in literary works. It does not mention the Florida litigation which was on-going at the time. In this context, the terminology "that I ... may hereafter possess" makes sense to mean rights that result from a remedy achieved in the Florida litigation.
{12} Our conclusion is supported when we analyze the nature of a cause of action as a property right. The parties do not dispute that Decedent's Florida cause of action is a property right which can be inherited under New Mexico law. See In re Morrow's Will, 41 N.M. 723, 735-36, 73 P.2d 1360, 1368 (1937). This property right, the cause of action, is distinguishable from a remedy. See Key v. Chrysler Motors Corp., 1996-NMSC-038, 121 N.M. 764, 768, 918 P.2d 350, 354 ("A cause of action is defined as an `aggregate of operative facts which give rise to a right enforceable in the courts.'" (quoting 2 James Wm. Moore et al., Moore's Federal Practice ¶ 2.06c, at 2-56 (2d ed.1998))); see also 1 Am.Jur.2d Actions §§ 1, 2 (1994) (cause of action is a matter of substance concerned with violation of a right, not a matter of remedy); John Norton Pomeroy, Code Remedies: Remedies and Remedial Rights §§ 346-47, at 527 (Walter Carrington, ed., rev. 5th ed.1929) (result to be obtained is the remedy or "object of the action," not the "cause of action"). Thus, while the cause of action is inheritable, the remedy, because it is a contingency, is not part of the inheritance. The cause of action is only the right to pursue the remedy.
{13} The requested remedy of the Florida litigation is to revoke or set aside Gabrielle's will. If that will is set aside, Decedent's estate and other heirs will inherit Gabrielle's estate through intestacy. The contents of this estate presumably also include property other than Jack Kerouac's literary rights. As this other property would be outside the control of the literary personal representative, the literary personal representative would be under no obligation to protect Decedent's rights to such property. While the underlying reason of the Florida *195 litigation may be to obtain control of Jack Kerouac's literary rights, that purpose is not the direct cause of action being pursued.
{14} We recognize Decedent's intent to preserve the integrity of the literary works. By our conclusion, we are not depriving the literary personal representative of his role to manage Decedent's right to literary property. The role of the literary personal representative is to manage the rights to literary works owned by Decedent's estate by making decisions about publication and sale and doing so with "due regard to fostering economic return without devaluing or cheapening the literary works." See In re Estate of Hellman, 134 Misc.2d 525, 511 N.Y.S.2d 485, 488 (Sur.Ct.1987) (management of literary rights "requires a delicate balance between economic enhancement and cultural nurture"). At the present time, these works include Decedent's own literary accomplishments, and, apparently certain works of her father. Decedent's estate does not yet, and may never, own the rights to her father's works that are at stake in the Florida litigation. If the Florida litigation is resolved in favor of Decedent's position, and the estate later inherits ownership of the literary property at stake in the Florida litigation, the authority to manage them will fall under the purview of the literary personal representative. Since the cause of action is a "property right," not a "literary right," the estate's connection to the literary property at stake in the Florida litigation is too remote at this time for the literary rights to be considered rights which fall within the first codicil.

Conclusion
{15} Decedent's codicil is unambiguous. It carves from the general personal representative's authority "any rights that I now possess or may hereafter possess in any literary works." Prior to her death. Decedent did not possess the rights to her father's literary works that are at stake in the Florida litigation. Decedent's rights to the literary property at stake in the Florida litigation are inchoate in nature; her estate will not possess them unless and until the estate is victorious in the Florida litigation. We affirm the decision of the district court.
{16} IT IS SO ORDERED.
ALARID, J., concurs.
ARMIJO, Judge, dissenting.
{17} This appeal decides the fate of litigation that may significantly affect Jan Kerouac's (Decedent's) rights concerning the literary works of her father, Jack Kerouac. I respectfully dissent because I do not agree with the majority's refusal to recognize the Literary Personal Representative's authority to act within the separate domain established for him in Decedent's First Codicil to her Last Will and Testament.
{18} The relationship of Decedent to her father and his literary works can not be understated. Jack Kerouac was a prominent figure in the "beat" counterculture who authored 18 or more books, including the legendary On the Road. He was considered an icon of the "Beat Generation." Decedent also was an author in her own right. Her main source of income was from book royalties, including royalties for certain works of her father. Upon her death, and in accordance with the provisions of the First Codicil to her Last Will and Testament, her ex-husband was appointed to serve as General Personal Representative and her literary agent was appointed to serve as Literary Personal Representative of her estate. The Literary Personal Representative is the author of Memory Babe: A Critical Biography of Jack Kerouac and is considered an expert on the works of Jack Kerouac. The Literary Personal Representative also possessed experience as an author, teacher, lecturer, editor and literary agent. The present appeal arises from the General Personal Representative's efforts to unilaterally dismiss litigation in Florida without the Literary Personal Representative's knowledge or consent.
{19} The effect of such a dismissal will be to abandon any rights that Decedent's estate may have in certain literary property that once belonged to Jack Kerouac, including significant royalties. According to the Literary Personal Representative, the literary materials at stake in the Florida litigation *196 are being sold piecemeal to various collectors, thus defeating Decedent's intent to preserve the integrity of her father's literary estate for future scholarship.
{20} To allow the General Personal Representative to unilaterally dismiss the Florida litigation is contrary to Decedent's intent as expressed in her will and codicil. Further, it renders the Literary Personal Representative unable to effectively administer the estate's rights to literary property, an area in which he possesses particular expertise.
{21} The Probate Code recognizes that a will or codicil may place restrictions on the authority of personal representatives. See NMSA 1978, § 45-3-715(A) (1995). This practice is consistent with the principle that:
the power of an executor may be limited as to the subject-matter upon which it is to be exercised. Thus, the testator may make A. his executor for his plate and household stuff, B. for his sheep and cattle, C. for his leases and estates by extent, and D. for his debts due to him. So a person may be made executor for one particular thing only, as touching such a statute or bond, and no more. And the same will may contain the appointment of one executor for general, and another for limited purposes.
1 Sir Edward Vaughan Williams et al., A Treatise on the Law of Executors and Administrators 291 (6th Am. ed. 1877) (footnotes omitted); see also In re Will of Rubin, 143 Misc.2d 303, 540 N.Y.S.2d 944, 945 (Sur.Ct.1989) (recognizing right of testator to limit, qualify, or condition authority granted to his fiduciary as to subject matter, such that one executor may be given exclusive authority over a particular group of assets); In re Bartlett's Estate, 198 Misc. 1000, 101 N.Y.S.2d 675, 676 (Sup.Ct.1950) (while there is no such thing as "literary executor" under New York law, a person may be designated as executor solely for purpose of administering literary property).
{22} In this case, the provision in Decedent's codicil "concerning any rights that [she] now possess[es] or may hereafter possess in any literary works or literary archival materials" is a valid restriction on the General Personal Representative's authority. In ascertaining Decedent's intent, we cannot disregard this restriction and isolate other provisions in the will or codicil such as those which authorize the Literary Personal Representative to make decisions about "the appropriate publication, republication, sale, license or any other exploitation [of] literary works or materials." We must read each part in the context of the testamentary instrument as a whole. See New Mexico Boys Ranch, Inc. v. Hanvey, 97 N.M. 771, 773, 643 P.2d 857, 859 (1982); In re Will of McDowell, 81 N.M. 562, 563, 469 P.2d 711, 712 (1970).
{23} Reading the will and codicil as a whole and applying relevant provisions of the Probate Code, the only logical conclusion is that, within each of their respective domains, each personal representative has those powers which are necessary for him to carry out the purposes of Decedent's will and his duties thereunder. See generally §§ 45-3-711, -715, -720; cf. City Bank & Trust Co. v. Morrissey, 118 Ill.App.3d 640, 73 Ill.Dec. 946, 454 N.E.2d 1195, 1199 (Ill.App.Ct.1983) (trustee will take whatever legal estate is necessary for him to carry out the purposes of testamentary trust and his duties thereunder); Rentz v. Polk, 267 S.C. 359, 228 S.E.2d 106, 108 (S.C.1976) (where testamentary trust gave trustee power to borrow, rent, invest, and collect income with expectation that assets increase in value, it would be impossible for trustee to perform duties imposed upon her unless she had legal title to trust property).
{24} The majority's decision today effectively denies the Literary Personal Representative any powers with respect to the Florida litigation on the basis of an arcane distinction between a cause of action and a remedy. This ignores both Decedent's intent to restrict the General Personal Representative's authority to non-literary property and the practical aspects of administering a literary estate. As one scholar notes,
the estate of a[ ] [famous] author is ... likely to consist of a mass of intangible rights, contracts, rights to receive royalties and other income, rights to exercise artistic control and business control, merchandising rights and the like. All of these *197 require active management, exploitation, unity of purpose in management and constant police work to maximize their value.... A cumbersome division of the rights into competitive shares will substantially reduce their value.
Allen H. Arrow, Estate Planning Problems of Authors, Performers, and Other Creative Persons, 9 Univ. of Miami Inst. on Estate Planning ¶ 1709, at 17-14 (1975); see also In re Estate of Hellman, 134 Misc.2d 525, 511 N.Y.S.2d 485, 488 (Sur.Ct.1987) (giving effect to testator's intent that her rights in literary property "be handled in a unified, expert and appropriate manner"); Cym H. Lowell & Terry R. Abel, Estate Planning for the Instantly Wealthy Including Resident and Non-Resident Aliens, 23 Univ. of Miami Inst. on Estate Planning ¶ 1602.5, at 16-15 to 16-16 (1989) ("The ongoing monitoring of rights pursuant to copyright laws, handling intangible assets and enforcing merchandising and contractual rights may well necessitate a unity of action.").
{25} I fear that the majority's distinction between a cause of action and a remedy will result in a cumbersome division of authority between the two personal representatives in this case, one who possesses the requisite expertise to administer literary assets, one who does not. Such a cumbersome division would be contrary to the provision in Decedent's codicil which assigns the Literary Personal Representative the task of "fostering economic return without devaluing or cheapening the literary works or any intellectual property rights flowing therefrom, or in any way reflecting negatively on me, my father, or my heirs or beneficiaries ." For these reasons, I must respectfully dissent.